**MESTER MANUFACTURING COMPANY, Petitioner,**

v.

**IMMIGRATION AND NATURALIZATION SERVICE, et al., Respondents.**

No. 88–7296.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted May 1, 1989.

Decided June 23, 1989.

As Amended Aug. 4, 1989.

Peter N. Larrabee, San Diego, Cal., for petitioner.

Karen L. Fletcher, Mark C. Walters, Michael J. Creppy and Martin D. Soblick, Dept. of Justice, Office of Immigration Litigation, Washington, D.C., for respondents.

Before POOLE, BEEZER and TROTT, Circuit Judges.

BEEZER, Circuit Judge:

Mester Manufacturing Co. ("Mester") petitions this court for review of an order of an administrative law judge ("ALJ") penalizing Mester for violations of the Immigration Reform and Control Act of 1986 ("IRCA"). Pub.L. No. 99–603, 100 Stat. 3359 (1986) (codified in scattered sections of 8 U.S.C.). We affirm.

I

*The Statute*

This is the first circuit court review of employer sanctions under IRCA. IRCA is a major change in immigration law. *See generally* Symposium, Implementation of IRCA, 2 Geo.Immigr.L.J. 447 (1988). IRCA puts part of the burden of compliance upon employers. 8 U.S.C. § 1324a (Supp. V 1987). It is unlawful for an employer knowingly to hire an alien who is unauthorized to be employed in the United States, or to continue to employ an alien in the knowledge that his employment is unauthorized. *Id.* at § 1324a(a)(1), (2). The statute sets up an employment verification system under which an employer must execute a verification form ("I–9") attesting, under penalty of perjury, that it has verified that each employee (whether a U.S. citizen or an alien) is not an unauthorized alien by examining the requisite document, or documents, showing identity and employment authorization. *Id.* at § 1324a(b). The individual hired must also attest to his own eligibility. *Id.* at § 1324a(b)(2).

The attorney general is authorized to investigate violations of IRCA. *Id.* at § 1324a(e). That duty has been assigned to the Immigration and Naturalization Service ("INS").[1] 8 C.F.R. § 100, *et seq.* (1988). Persons charged with IRCA violations are entitled to notice, and to a hearing conducted by an ALJ in accordance with the Administrative Procedure Act. 8 U.S.C. § 1324a(e)(3); *see* 5 U.S.C. § 554 (1982).

The ALJ may require violators of IRCA's employment provisions to pay civil money penalties, and may issue a cease-and-desist order requiring future compliance with the statute. 8 U.S.C. § 1324a(e)(4). A "pattern or practice" of employment violations may lead to criminal penalties. *Id.* at § 1324a(f). A failure to adhere to the employment verification system, referred to as a "paperwork violation," will lead to a civil money penalty only, of a generally lesser amount than for an employment violation. *Id.* at § 1324a(e)(5). The ALJ's order becomes a final agency order 30 days

after its issuance, if the agency does not modify or vacate it. *Id.* at § 1324a(e)(7). A party adversely affected by a final order may petition the Court of Appeals for review within 45 days after the order becomes final. *Id.* at § 1324a(e)(8).

Because of the burdens IRCA places upon employers, Congress provided for gradual implementation. The six-month period following enactment in November 1986 was a public information period; the appropriate agencies were to disseminate forms and information to employers during this period, and no enforcement action was to take place. *Id.* at § 1324a(i)(1). The subsequent twelve-month period, between June 1, 1987 and June 1, 1988, was the "first citation period." *Id.* at § 1324a(i)(2). "In the case of a person or entity, in the first instance in which the [INS] has reason to believe that the person or entity may have violated [IRCA] ... the [INS] shall provide a citation to the person or entity indicating that such a violation or violations may have occurred and shall not conduct any proceeding, nor issue any order, under this section on the basis of such alleged violation or violations." *Id.* at § 1324a(i)(2). This case arose during the first citation period.

II

*Facts*

Mester manufactures furniture at facilities in El Cajon, California, and Tijuana, Mexico. The El Cajon facility, employing about 70 people on the average, is at issue here.

On July 2, 1987, agent Stephen A. Shanks of the INS Border Patrol made an initial educational visit to Mester. Shanks left a copy of the INS' "Handbook for Employers" and his business card for Mester's managers, none of whom was available at the time. No Mester official contacted Shanks, and Shanks did not make a return visit.

Shanks phoned Mester on August 7, 1987. He spoke with a senior official of Mester, James Saturley, who appeared sat-

---

1. We will refer collectively to the government appellees as "the INS."

isfied with his present level of knowledge regarding IRCA. The owner of the company, Barry Mester, expressed no interest, at any time, in understanding and complying with the law. "Rarely in my experience," said the ALJ, "has an employer demonstrated as did Barry Mester on the stand such a manifest lack of interest in the personnel practices of his own domain."

On August 26, 1987, the INS notified Mester of its intention to inspect the I–9's on file there, pursuant to 8 U.S.C. §§ 1324a(e)(1)(C) and (2)(A).[2] On September 2, Shanks and three other Border Patrol agents inspected these documents. In response to Saturley's questions, the agents said they would get back to him.

The next day, Shanks and another agent returned to Mester to deliver the citation required by IRCA for a first violation. The citation alleged that Mester had violated "Section 274A(b)(1) of the Immigration and Nationality Act" (8 U.S.C. § 1324a(b)(1)) with respect to 11 named individuals. The citation thus alleged only paperwork violations. However, several counts contained statements that aliens were "still employed" after their work authorizations had expired, and others alleged that I–9's had not been completed for "illegal aliens," thus strongly suggesting that employment of these individuals, if continued, would violate 8 U.S.C. § 1324a(a)(2). The citation stated that no proceeding would result, and no penalties would be imposed.

In addition to the citation, Shanks gave Barry Mester a handwritten "interview list" containing, *inter alia*, the names of three employees whom the INS suspected of using false alien registration cards ("green cards"). The testimony regarding exactly what transpired between Shanks and Mester officials was confusing and contradictory. The ALJ found that Mester was put on notice that it should check the green card numbers of these employees and that, if the numbers matched those on the interview list that the INS had found in a computer search to belong to other aliens, they should be fired. Apparently, however, the Mester employee assigned to check the numbers operated under the false impression that if the numbers matched, the employees were authorized. Mester refused to allow the INS to interview the employees directly.

On September 8, Saturley wrote to the INS to complain that the four armed agents had intimidated Mester employees, and had not been forthcoming in responding to questions. On September 22, the INS announced a second inspection. That same day, Mester responded in writing to each allegation in the citation.

On September 25, Shanks and three agents again inspected Mester's I–9's. As a result of the inspection, the INS served a Notice of Intent to Fine ("NIF") on Mester on October 2, alleging that seven named employees had been continued in employment after Mester had learned on September 3, 1987 (presumably from the citation or the accompanying verbal information) that they were not authorized to work, all in violation of 8 U.S.C. § 1324a(a)(2) (the "employment violations").[3] The NIF also alleged nine paperwork violations for failure to present I–9's of specific employees for inspection on September 25. Mester requested a hearing. On November 16, 1987, the INS served a complaint asking that an ALJ conduct a hearing, issue a cease-and-desist order, and impose civil penalties on Mester. The complaint incorporated the NIF by reference.

Between February 9 and 12, 1988, ALJ Marvin H. Morse conducted an exhaustive

---

**2.** Mester does not raise any fourth amendment claim in its appeal.

**3.** Although factually simple, some of the violations were alleged in puzzling ways. Count 5, for example, states:

    5.(A) In December, 1986 you hired Miguel Castel–Garcia.

    (B) On September 3, 1987 you were informed that Miguel Castel–Garcia was an alien not authorized to work in the United States.

    (C) On September 16, 1987, after having obtained such information, you continued to employ Miguel Castel–Garcia on or after August 24, 1987.

The ALJ sharply criticized the NIF, which he understood only through "herculean effort."

hearing. The record extends to more than 2500 pages. The ALJ's written findings are extraordinarily detailed and thorough. The ALJ found in favor of the INS on counts 1–3 and 5–7, six of the employment violations. He dismissed count 4 because the evidence was not sufficient to find that Mester had employed that individual knowing of his unauthorized status, and dismissed all the paperwork violations, counts 8–17, because the NIF incorrectly stated which section of IRCA had been violated, and the error meant that Mester had insufficient notice of the charges.[4]

On June 17, 1988, the ALJ issued a cease-and-desist order lasting one year, and penalized Mester $500 for each of the six violations. As the Chief Administrative Hearing Officer of the Executive Office for Immigration Review of the Department of Justice did not modify or vacate the ALJ's findings, the decision and order became final after 30 days. *See* 8 U.S.C. § 1324a(e)(7). Mester timely petitioned this court for review. *See id.* at § 1324a(e)(8). We have jurisdiction. *Id.*

■ We must define the standard of review of an ALJ's decision in an IRCA hearing. The INS correctly suggests that the APA standard of review should apply. *See* 5 U.S.C. § 706(2) (1982). IRCA requires that hearings be conducted in accordance with the Administrative Procedure Act. 5 U.S.C. § 554; 8 U.S.C. § 1324a(e)(3)(B). Therefore, we grant agency hearings under IRCA the same deference we give to other agency formal adjudications. We may only overturn agency findings of fact that are unsupported by substantial evidence. *FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447, 454, 106 S.Ct. 2009, 2015, 90 L.Ed.2d 445 (1986); *Containerfreight Corp. v. United States*, 752 F.2d 419, 422 (9th Cir.1985); 5 U.S.C. § 706(2)(E).

■ We apply a de novo standard of review to an agency's conclusions of law. *Desir v. Ilchert*, 840 F.2d 723, 726 (9th Cir.1988); *see Indiana Fed'n of Dentists*, 476 U.S. at 454, 106 S.Ct. at 2015; 5 U.S.C.

§ 706(2); *but see USCP–Wesco, Inc. v. NLRB*, 827 F.2d 581, 583 (9th Cir.1987) (applying arbitrary and capricious standard of review to NLRB conclusion of law as to jurisdiction). Within the de novo framework, however, we give a certain amount of deference to an agency's reasonable construction of a statute it is charged with administering. *Indiana Fed'n of Dentists*, 476 U.S. at 454, 106 S.Ct. at 2015 (agency's informed judgment applying applicable legal standard to facts entitled to "some deference"); *United States v. Clark*, 454 U.S. 555, 565, 102 S.Ct. 805, 811, 70 L.Ed.2d 768 (1982) (consistent agency construction of statute over long period of time is "entitled to great deference"); *see USCP–Wesco*, 827 F.2d at 583 (courts give considerable deference to NLRB expertise in interpreting labor statutes); S. Childress & M. Davis, *Standards of Review* §§ 15.2; 15.-10; 17.2 (1986). If an agency's construction is reasonable, and consistent with congressional intent, we will accept it. *Committee for an Independent P–I v. Hearst Corp.*, 704 F.2d 467, 473 (9th Cir.), *cert. denied*, 464 U.S. 892, 104 S.Ct. 236, 78 L.Ed.2d 228 (1983); *Columbia Basin Land Protection Ass'n v. Schlesinger*, 643 F.2d 585, 599–600 (9th Cir.1981). Our deference to reasonable statutory interpretation extends to a new statute as well as to a longtime agency interpretation. *Compare Clark*, 454 U.S. at 565 (great deference to consistent agency construction), *with Independent P–I*, 704 F.2d at 472 ("a long-term interpretation is not a necessary precondition to our deferring to an agency's construction of a statute"), *and Columbia Basin*, 643 F.2d at 599–600 (particular deference to be given to agency's reasonable construction of a new statute).

We reserve to ourselves, of course, the final authority to decide questions of statutory construction. *See California Energy Resources Conservation & Dev. Comm'n v. Johnson*, 807 F.2d 1456, 1461 (9th Cir. 1986). We consider the constitutionality of

---

**4.** The NIF alleged violation of 8 U.S.C. § 1324a(b)(1) for failure to present I–9's; the proper section was 8 U.S.C. § 1324a(b)(3).

IRCA as a legal question of first impression.

## III

*Count 1*

■ Count 1 of the NIF alleged that "[o]n September 3, 1987 you [Mester] were informed that Francisco Estrada–Bahena had presented a false [green card] and was not an alien authorized to work in the United States. On September 25, 1987 Francisco Estrada–Bahena was still employed by you." The ALJ found that Estrada–Bahena's name was on the list of suspected unauthorized aliens, with green card numbers, given to Mester by Shanks on September 3. He further found that Mester received notice from Shanks that if the number on the list matched that on Estrada–Bahena's green card, Estrada–Bahena was unauthorized. Therefore, Mester was on notice as to Estrada–Bahena's suspect status. Mester made no inquiry of the INS, but unreasonably continued Estrada–Bahena's employment. The ALJ found Mester to have violated IRCA.

Mester argues that the evidence was insufficient for the INS to meet its burden of proof that in fact Estrada–Bahena was using a false green card. The INS relied on a computer search of its records system that revealed the false green card. Mester offered some evidence at the hearing that the system was prone to error, and offers this court other evidence outside the record in the form of a GAO report.[5]

Mester argues that a secondary search of the records should have been conducted. Mester's general allegations of unreliability are accompanied by no specific contention,

supported by facts, that the INS finding that Estrada–Bahena had a false green card is incorrect. The INS made a *prima facie* showing that the green card was false, and Mester failed to produce any evidence to the contrary. The ALJ's finding is supported by substantial evidence.[6]

*Counts 2 and 3*

■ Counts 2 and 3 were very similar to count 1. They alleged that Mester was informed on September 3 that Santiago Mejia–Garcia and Jorge Maciel–Mejia had presented false green cards, but that on September 25 the two were still employed.

Mester contends, as a matter of law, that it did not have knowledge of the status of the aliens in counts 1–3 sufficient to find it liable because the form of notice was improper. Mester argues that unless it received official written notice from the INS that the green cards were false, it did not have knowledge. As the ALJ noted, however, the statute does not require that the knowledge come to the employer in any specific way.[7] The statutory scheme of citations and NIF's does not directly relate to the scienter element of the substantive offense. The INS must show, of course, by a preponderance of the evidence that the employer knowingly employed an unauthorized alien. 8 U.S.C. § 1324a(e)(3)(C).

Here, the employer was put on notice that three aliens were suspected of green card fraud. The employer was instructed how to confirm this information. If the instructions had been delivered more formally, Mester might have followed them correctly. However, such speculation does not negate the offense. Barry Mester re-

---

5. Mester also spent much of its oral argument time contending that an INS manual of procedures established investigative procedures that have the force of law, and that these procedures were violated. It appears that Mester's edition of the manual was published after the events in question. The document is completely outside the record. Mester has not moved the court to supplement the record, nor has it argued as a grounds for appeal that the INS improperly withheld this document in the administrative proceedings. Accordingly, we decline to consider any arguments based on the manual.

6. The INS contends that Mester failed to exhaust its administrative remedies because it did not argue at the hearing that the INS had failed to prove Estrada–Bahena was not authorized. *See Reid v. Engen,* 765 F.2d 1457, 1460 (9th Cir.1985). It is apparent, however, that the relevant issues of fact were considered by the ALJ.

7. Mester's argument that 8 C.F.R. § 103.5a (1988) required written notification of all violations is meritless. This regulation prescribes methods of service, rather than defining what information must be conveyed by means of formal service.

ceived specific information that several of his employees were likely to be unauthorized. He made no further inquiry of the INS, and failed to take appropriate corrective action. The aliens turned out to be unauthorized. The knowledge element was satisfied; Mester had constructive knowledge, even if no Mester employee had actual specific knowledge of the employee's unauthorized status. *Cf. United States v. Jewell*, 532 F.2d 697 (9th Cir.) (en banc) (in criminal law, deliberate failure to investigate suspicious circumstances imputes knowledge), *cert. denied*, 426 U.S. 951, 96 S.Ct. 3173, 49 L.Ed.2d 1188 (1976).

*Count 5*

█ Count 5 of the NIF alleged that Miguel Castel–Garcia had been retained in employment after Mester had learned on September 3 that he was unauthorized. The citation had previously alleged that no I–9 had been completed for Castel–Garcia, an "illegal alien." Thus, unlike counts 1–3, the written citation required by the statute later served as the proof for the knowledge element of the violation. Also unlike the aliens in counts 1–3, Castel–Garcia was fired on September 17, 1987, two weeks after the citation was issued.

Mester argues that it had a good-faith belief that Castel–Garcia was a legal "grandfathered" employee hired before the passage of IRCA. 8 C.F.R. § 274a.7 (1988). However, the ALJ found that Mester's records showed that Castel–Garcia had quit in December 1986, and had been rehired in April 1987, thus removing his authorization. He also found that Mester had not acted on its asserted belief by contacting the INS in a timely fashion to resolve the discrepancy.

Count 5 raises a troubling question: When must an employer terminate an employee upon learning that he or she is unauthorized to work in the United States? Mester fired Castel–Garcia only two weeks after receiving the citation. Because Mester had knowledge of Castel–Garcia's unauthorized status only after September 3, the violation was the two weeks of employment

prior to termination. Was Mester required to fire Castel–Garcia the very day it received the citation? Or should the company have been allowed a reasonable period of time in which to allow Castel–Garcia to wind up his employment? The statute does not answer these questions.[8]

We interpret a statute "to avoid untenable distinctions and unreasonable results whenever possible." *American Tobacco Co. v. Patterson*, 456 U.S. 63, 71, 102 S.Ct. 1534, 1538, 71 L.Ed.2d 748 (1982); *accord Bechtel Constr., Inc. v. United Bhd. of Carpenters & Joiners*, 812 F.2d 1220, 1225 (9th Cir.1987) ("Legislative enactments should never be construed as establishing statutory schemes that are illogical, unjust, or capricious."). Counsel for the INS conceded that a basic rule of reason would apply at some point to IRCA enforcement actions. It is apparent that the potential for unjust or capricious action exists. For example, the text of the statute would not prohibit an INS agent from informing Mester at 11:55 a.m. that one of its employees was unauthorized, issuing an NIF at 12:00 noon, and seeking sanctions for this five-minute "continued knowing employment." The potential for abuse is heightened, in our view, by our recognition that employers are subject to a host of other federal and state laws affecting their right to terminate employees summarily. *See, e.g., Patel v. Quality Inn South*, 846 F.2d 700, 704–05 (11th Cir.1988) (Fair Labor Standards Act's coverage of undocumented aliens not repealed by IRCA), *cert. denied*, —— U.S. ——, 109 S.Ct. 1120, 103 L.Ed.2d 182 (1989).

Counsel for the INS recognized that employer sanctions for the five-minute violation would likely be unreasonable, but maintained that 21 or 30 days continued employment would not be reasonable, especially in light of the allegedly transient and casual nature of much border employment. It appears that the INS wishes to proceed on an entirely *ad hoc* basis that will undoubtedly force this court to sketch out some standard of reasonableness in future

---

**8.** Nor does the legislative history provide useful guidance. *See* Immigration Reform and Con- trol Act of 1986, 1986 U.S.Code Cong. & Admin. News 5649.

litigation. Legislative or regulatory action that would set forth some reasonable time frame for termination acceptable to employers and the INS would seem appropriate.[9] Absent any such guidance, however, or any independent reason to apply a different construction of the statute than that of the ALJ, we defer to the ALJ's conclusion, based on the relevant facts, that a two-week delay in firing Castel–Garcia amounted to an IRCA violation.[10]

### Count 6

■ Count 6 charged that on September 16, 1987, Mester "continued" the employment of Ramiro Santoyo–Zavala, after having learned on September 3 (from the citation) that he was an unauthorized alien. Santoyo–Zavala was fired on September 24. The ALJ found that the citation had put Mester on notice, that the employee was unauthorized, and that Mester had failed to terminate the employee promptly.

Mester contends that the INS did not disclose the fact that the alien had recently been arrested for immigration law violations in its citation, that the citation was misleading in that it accused Mester of failing to present an I–9 when in fact one was presented, and that the INS failed to respond to Mester's good-faith inquiries. As it happened, Santoyo–Zavala's I–9 was insufficient because Mester had accepted inadequate documentation, an I–94 record of entry without a work authorization stamp. The fact remains that Mester received notice on September 3 that the employee was an unauthorized alien, and it did not fire him, or even take investigatory action within a reasonable time. The ALJ correctly concluded that Mester had violated IRCA.

### Count 7

■ Count 7 charged Mester with having continued the employment on September 17, 1987, of Juventino Barranca–Ballesteros, after having learned on September 3 that his "special rule status" had expired. The citation (allegation 5) had stated that this "special rule" alien had been employed after September 1 without a work authorization document recorded on his I–9. The ALJ again found that Mester had merely assumed that the citation was incorrect, rather than investigating the alien's status in a timely manner.

Mester contends that in fact Barranca–Ballesteros was not a special rule alien, and that he had submitted adequate documentation. A special rule alien is one who has applied for legalization under IRCA. See 8 C.F.R. §§ 274a.2(b)(i)(B); 274a.11 (1988). These aliens have conceded their unlawful presence in the United States. See 8 U.S.C. § 1255a (Supp. V 1987). IRCA allowed them to work without authorization documents until September 1, 1987; after that date, they required such documentation, to be provided by the INS to legitimate legalization candidates. 8 U.S.C. § 1255a(e)(2)(B); 8 C.F.R. § 274a.11.

Barranca–Ballesteros' employment file contained evidence of his intention to apply for legalization. It cannot seriously be contended that Mester was unaware of his unauthorized status after September 3. Confusion arose, however, over the documentation requirements. Contrary to the citation, Mester's I–9 on file for this alien was supported by adequate documentation —a social security card and a driver's license. See 8 U.S.C. § 1324a(b)(1)(C)(i), (D)(i). However, Mester confuses the violation charged, knowing employment of an

9. In this case, the ALJ considered the steps taken, or not taken, by Mester to confirm the information provided by the INS on September 3 before terminating employees. It is apparent that an inquiry into a reasonable time frame for termination will include consideration, in certain cases, of factors other than the number of days alone—such as the certainty of the information providing the knowledge of unauthorized status, and steps taken by the employer to confirm it. In none of the situations at issue here do we conclude that the ALJ finding of an IRCA violation was an unreasonable application

of the statute, based on our consideration of all the relevant facts.

10. Mester points out that two other employees it fired on September 11 and September 17 (the same date as Castel–Garcia) were not the subject of enforcement proceedings. The INS is entitled to be inconsistent in its prosecutorial discretion, odd as its decisions may seem. See, e.g., Seven Star, Inc. v. United States, 873 F.2d 225, 227 (9th Cir.1989).

unauthorized alien, with the paperwork violation that can result from an inadequate I–9. Even if the I–9 was entirely satisfactory, if the INS can show that Mester had knowledge of an employee's unauthorized status, and continued him in employment, that fact is of little assistance to Mester.[11] The ALJ's findings that Mester had such knowledge, and failed to act on that notice promptly were supported by substantial evidence, and his conclusion that IRCA was violated is correct.

## IV

Mester raises several general objections to the ALJ's decision, besides objecting specifically to the counts found to be violations. Mester argues that the IRCA sanctions violated substantive and procedural due process, and that the statute is entirely null and void because Congress' method of presenting it to the President violated the Constitution.[12] Mester also contends that the INS violated the statutory scheme of IRCA, thus nullifying the penalities as a statutory matter.

Mester argues that it was denied procedural due process because of the allegedly irregular and insufficient notice it received. Mester relies upon *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). *Mathews* reaffirmed, in the context of administrative adjudication, the common proposition that a party is entitled to adequate notice and a fair hearing before a final deprivation of a property interest. *Id.* However, the Court held that a full adjudicative hearing is not required in all cases. *Id.* at 342–43, 96 S.Ct. at 906–07. *Mathews* applied a flexible standard of due process that weighs the governmental against the private interests asserted. *Id.* at 334–35, 96 S.Ct. at 902–03.

■ Neither *Mathews* nor Ninth Circuit interpretations of procedural due process supports Mester's argument. *See, e.g., Jordan v. City of Lake Oswego*, 734 F.2d 1374, 1376 (9th Cir.1984); *Nicholas v. INS*, 590 F.2d 802, 809–10 (9th Cir.1979). First, by arguing that the citation violated due process, Mester confuses the knowledge element of its offense with the notice constitutionally required to prosecute it. The citation did not lead to the final deprivation of property from Mester. The adjudicatory proceedings were initiated by the NIF. Although this document was not as clear as it could have been, as the ALJ noted, it gave adequate notice to Mester of the charges— at least, of those before us on appeal—and allowed Mester to defend itself. Mester does not challenge the adequacy of the hearing.

■ Mester's argument that it was deprived of substantive due process is wholly without merit. *See, e.g., United States v. Salerno*, 481 U.S. 739, 746, 107 S.Ct. 2095, 2100–01, 95 L.Ed.2d 697 (1987) (substantive due process prohibits only governmental conduct that shocks the conscience or interferes with rights implicit in the concept of ordered liberty).

Mester had a statutory right to receive a citation before any enforcement proceedings were initiated. But the citation was a predicate to the enforcement proceeding, not a part of it. Mester apparently believes that it had a right to a thorough briefing as to its violations of IRCA prior to enforcement. Mester's claimed ignorance of the statutory requirements is no defense to charges of IRCA violations. It is true that Congress provided for education of employers during the early period of IRCA. However, we do not read that accommodation to employers as in any way giving them an entitlement to the education, or prohibiting sanctions against an employer that can show that it has not received a handbook or other instruction, or

---

**11.** Compliance with the paperwork procedures establishes a good faith defense against a finding of unlawful hiring. 8 U.S.C. § 1324a(a)(3). Proper paperwork does not insulate an employer against a continuing employment sanction under section 1324a(a)(2), however, if the employer gains the requisite knowledge of unlawful status.

**12.** Although these issues were not raised in the administrative proceeding, this court may always consider constitutional questions outside the agency's jurisdiction. *Reid*, 765 F.2d at 1461.

(as here) that it has simply failed to pay attention to them.

■ Mester also pursues a statutory challenge. Section 1324a(i)(2) appears to require the INS to cite all suspected violations. It would violate the spirit, and likely the letter, of this section for the INS to cite one suspected violation only, thereby allowing others suspected at the time of the citation to be the subject of immediate enforcement proceedings. By citing only paperwork violations while orally notifying Mester of suspected false green cards, it can be argued that this is what the INS has done. It is an open question, of course, whether an INS error in issuing the citation can preclude a later enforcement action.[13] But we need not reach the issue. The INS complied with the letter of the statute by citing only those violations—the paperwork violations—that actually were violations at that time. Because the knowledge element of the offenses of continuing to employ the three unauthorized aliens was not present on September 3, the offenses technically were not ripe, and thus not citable. They only became offenses after September 3, because the information conveyed by the INS on that date gave Mester the requisite knowledge.

Perhaps Mester would have complied better if the notice had been written. But since oral notice satisfied the knowledge element, we are unable to take Mester's advice and hold that the INS should institute better procedures. That is a matter of executive discretion. *E.g., Columbia Basin,* 643 F.2d at 596.

### V

■ Mester advances a novel argument asserting that IRCA is entirely null and void, as unconstitutionally passed. IRCA was passed in its final form by both houses of Congress on October 17, 1986. On October 18, 1986, the second session of the 99th Congress adjourned *sine die.* On October 30, 1986, the bill was presented to President Reagan for his signature. The President signed it on November 6, 1986, within the required ten-day period. U.S. Const. art. I, § 7, cl. 2. Mester argues that the bill was null and void before it ever reached the White House, however, because Congress has no constitutional authority to present a bill after adjournment *sine die.* As a party injured by action taken pursuant to the statute, Mester has standing to raise the claim. *See INS v. Chadha,* 462 U.S. 919, 935–36, 103 S.Ct. 2764, 2776, 77 L.Ed.2d 317 (1983).

In its brief, the INS dismisses the argument as "frivolous," noting that acceptance of Mester's argument would nullify not only IRCA, but many other statutes. This court, however, has not hesitated to declare legislation unconstitutional when Congress has failed to adhere to the procedural requirements of the Constitution. *See United States v. Munoz–Flores,* 863 F.2d 654 (9th Cir.1988) (vacating special assessments as violating origination clause); *see also Chadha,* 462 U.S. at 919, 103 S.Ct. at 2764 (finding legislative veto, commonly used by Congress, to violate Constitution). A law passed in violation of the Constitution is null and void *ab initio. Munoz–Flores,* 863 F.2d at 661.

Article I, section 7, clause 2 of the Constitution states: "Every Bill which shall have passed the House of Representatives and the Senate, shall, before it becomes a Law, be presented to the President...." The clause goes on to describe the President's ten-day period for consideration, and the procedures for a veto and veto override. The Constitution does not specify the timing and manner of presentment, however, as Mester concedes. Nor does the relevant statute shed much light on the subject.[14]

---

**13.** Mester would presumably have to succeed in the very difficult task of justifying estoppel against the government. *See, e.g., Heckler v. Community Health Services, Inc.,* 467 U.S. 51, 59–63, 104 S.Ct. 2218, 2223–25, 81 L.Ed.2d 42 (1984).

**14.** "When [a] bill ... shall have passed both Houses, it shall be printed and shall then be called the enrolled bill ... and shall be signed by the presiding officers of both Houses and sent to the President of the United States." 1 U.S.C. § 106 (1982).

Mester cites certain very old cases and commentaries, none binding upon this court, indicating that the procedure in the early years of the Republic was for the President to visit the Capitol in person so that he could sign legislation before adjournment. In modern times, however, presentment has often been delayed past adjournment.

The case law has tended to focus on the President's veto power, rather than on the power and duty of Congress to present. *See* R. Rotunda, J. Nowak & J. Young, *Treatise on Constitutional Law* § 10.7 (1986) [hereinafter Rotunda]. The constitutional provisions have been interpreted in terms of furthering their underlying policy goals: Allowing the President to consider the bills passed by Congress, and giving Congress the opportunity to respond to executive action. *See, e.g., Eber Bros. Wine & Liquor Corp. v. United States*, 337 F.2d 624, 627 (Ct.Cl.1964) (quoting *Wright v. United States*, 302 U.S. 583, 596, 58 S.Ct. 395, 400–01, 82 L.Ed. 439 (1938)).

Neither of these goals would be advanced by accepting Mester's argument. A delay in presentment does not remove the President's opportunity to consider legislation, although it might delay the start of his ten-day period. Congress, after all, has no incentive to pass legislation but then not to present it to the President, because the bill will never become a law.

A majority of each house constitutes a quorum to "do Business." U.S. Const. art. I, § 5, cl. 1. If the ministerial act of presenting a bill is "Business," then Mester might have a case. This argument was rejected by the Seventh Circuit, however, in the only appellate case to consider the question directly. *United States v. Kapsalis*, 214 F.2d 677, 679–83 (7th Cir.1954), *cert. denied*, 349 U.S. 906, 75 S.Ct. 583, 99 L.Ed. 1242 (1955). *Kapsalis* held that the ministerial acts of examination, enrollment, and presentment may unquestionably be delegated by Congress to its leadership, or to a standing committee, and that these delegated acts may be performed even when Congress stands adjourned *sine die. Id.* at 680–81. *Kapsalis* is persuasive, and we adopt it as the law of this circuit. In the absence of express constitutional direction, we defer to the reasonable procedures Congress has ordained for its internal business.

Supreme Court authority supports this position. In *Edwards v. United States*, 286 U.S. 482, 52 S.Ct. 627, 76 L.Ed. 1239 (1932), the Court considered and rejected the sort of historical arguments-by-example that Mester advances here, holding that the President may sign a bill after Congress adjourns *sine die.* The Constitution also requires extreme deference to accompany any judicial inquiry into the internal governance of Congress.[15] *See, e.g.,* U.S. Const. art. I, § 5, cl. 2 ("Each House may determine the Rules of its Proceedings ..."); *Field v. Clark*, 143 U.S. 649, 672, 12 S.Ct. 495, 497, 36 L.Ed. 294 (1892) (Court defers to Congress' certification that enrolled bill is correct); Rotunda, *supra*, at §§ 10.7, 10.9.

CONCLUSION

Mester has failed to meet its burden of showing that the ALJ's findings of fact were not supported by substantial evidence, or that his construction of IRCA was legally incorrect. We likewise reject Mester's constitutional challenges to IRCA. The decision and order of the Executive Office for Immigration Review is therefore AFFIRMED.

**15.** *Chadha* is not to the contrary. 462 U.S. at 919, 103 S.Ct. at 2764. In *Chadha,* the Court emphasized the importance of the presentment clauses to the constitutional scheme crafted by the founders, and expounded upon the duty of the judiciary to interpret that scheme. *See id.* at 943–48, 103 S.Ct. at 2780–83. The *Chadha* Court found the legislative veto unconstitutionally to violate the separation of powers, because it was legislation that had not been subjected to the explicit requirements of the presentment clause. Here, by contrast, Congress has acted interstitially to supplement the nonexplicit text of the Constitution with reasonable procedures that implement its commandment, rather than violate the Constitution—as it did with the legislative veto—by avoiding constitutional requirements.