**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

LOVE KOREAN CHURCH; DAE SONG
PARK,

   *Plaintiffs-Appellants,*

   v.

MICHAEL CHERTOFF, Secretary of
the United States Department of
Homeland Security; JONATHAN
SCHARFEN,* Acting Director of
United States Citizenship and
Immigration Service; DONALD W.
NEUFELD, Director of USCIS
California Service Center,

   *Defendants-Appellees.*

No. 07-55093

D.C. No.
CV-05-09021-RJK

OPINION

Appeal from the United States District Court
for the Central District of California
Robert J. Kelleher, District Judge, Presiding

Argued and Submitted
June 2, 2008—Pasadena, California

Filed December 5, 2008

Before: William C. Canby, Jr., Jay S. Bybee, and
Milan D. Smith, Jr., Circuit Judges.

Opinion by Judge Canby

*Jonathan Scharfen, is substituted for his predecessor, Emilio T. Gonzalez, as Acting Director of the United States Citizenship and Immigration Service, pursuant to Fed. R. App. P. 43(c)(2).

**COUNSEL**

Richard Sunghwan Kim, Los Angeles, California, for the plaintiffs-appellants.

Keith M. Staub, Assistant United States Attorney, Civil Division, Los Angeles, California, for the defendants-appellees.

**OPINION**

CANBY, Circuit Judge:

Love Korean Church (the "Church") appeals an order of the district court affirming the Bureau of Citizenship and Immigration Services' ("CIS") revocation of a visa petition filed by the Church on behalf its choir director. The Church

had sought to have its choir director, a Korean citizen, classified as a "special immigrant" religious worker within the meaning of 8 U.S.C. § 1101(a)(27)(C). Because the revocation of the visa petition was predicated on legal error and findings of fact unsupported by substantial evidence, we vacate the judgment of the district court and remand this case for further consideration by the agency.

## BACKGROUND

Love Korean Church is a non-profit religious organization affiliated with the Korean Presbyterian denomination. The Church was originally established in the 1980s to meet the spiritual needs of the growing Korean-American community in the Los Angeles area. The Church views religious music as a form of worship and an integral component of its ritual celebrations.

Since 1994, the Church has benefitted from the work of Dae Song Park, a native and citizen of the Republic of Korea. Park was originally admitted to the United States as a temporary visitor in January 1994. Shortly after his arrival, he became a member of the Church and began serving as its choir director on a volunteer basis. In 1995, Park successfully adjusted his immigration status to that of a full-time student, so that he could attend English language courses at a local school. In January 1997, Park transferred to California Union University, where he enrolled in music classes and began pursuing a Master's degree in music. Throughout this time and until September 1998, Park continued serving as the Church's volunteer choir director. In October of 1998, when Park's application for adjustment of status to religious worker was pending and permitted employment, the Church hired him as a full-time salaried choir director.

During the period from March 1997 to November 2001, the Church filed on Park's behalf three I-360 petitions for a religious worker visa. This appeal concerns only the third peti-

tion, which the CIS initially approved.[1] In September 2003, CIS issued a Notice of Intent to Revoke the approved petition, stating that Park's "duties do not relate to a traditional religious function. The tenets of a particular religious denomination should have significance on the performance of the duties of the position being offered."

CIS subsequently revoked the approved third I-360 petition. CIS found that Park was a full-time student during the two-year period from November 1999 to November 2001, and he therefore could not have been carrying on full-time salaried work as choir director for the Church. It also concluded that the duties listed in the Church's petition could be performed by a part-time volunteer and did not reflect a full-time position.

The Church filed an administrative appeal of the decision revoking the third I-360 petition which the Administrative Appeals Office ("AAO") dismissed. First, the AAO pointed out some discrepancies between two documents submitted by the Church in support of its petition—a weekly work schedule and a diagram summarizing Park's duties between November 1999 and November 2001—and noted that the Church had submitted no evidence to explain the inconsistencies. The AAO next concluded that the position as described in the Church's weekly work schedule did not qualify as a "religious occupation" under the statute and regulations because: (1) the Church failed to establish that all the duties listed in the weekly work schedule were related to the position of choir director and were not primarily secular in nature ; and (2) the position had not been shown to be (a) directly related to the Church's religious creed, (b) recognized by the governing body of its denomination, and (c) traditionally a permanent, full-time, salaried occupation within the denomination.

---

[1]The first petition was denied. The second was approved but revoked two days after revocation of the third petition. In the present proceeding, the Church contests only the revocation of the third petition.

Finally, the AAO concluded that the evidence did not establish that Park was continuously engaged as choir director during the two years immediately preceding the filing of the visa petition, because the work schedule indicated that Park served at most thirteen hours per week in music-related activities.[2]

Park and the Church filed an action for declaratory relief in the district court, claiming that the revocation of the third I-360 petition was not supported by "sufficient and good cause." The district court granted summary judgment for the government. This appeal followed.

## DISCUSSION

The district court's jurisdiction to review CIS' revocation of the Church's visa petition is predicated on 28 U.S.C. § 1331 and reinforced by the enactment of the Administrative Procedure Act ("APA"), 5 U.S.C. § 701(a)(2). *ANA Int'l, Inc. v. Way*, 393 F.3d 886, 890 (9th Cir. 2004) (holding that visa revocations pursuant to 8 U.S.C. § 1155 are not made unreviewable by either 8 U.S.C. § 1252(a)(2)(B)(ii) or 5 U.S.C. § 701(a)(2)). Our appellate jurisdiction arises under 28 U.S.C. § 1291, and we review de novo the district court's grant of summary judgment. *Spencer Enters., Inc. v. United States*, 345 F.3d 683, 692 (9th Cir. 2003). Under the APA, we will reverse an agency's action if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), or if its factual findings are "unsupported by substantial evidence," *Mester Mfg. Co. v. INS*, 879 F.2d 561, 565 (9th Cir. 1989). To the extent the agency "interpret[ed] its own regulation, even if through an informal pro-

---

[2]The AAO's dismissal does not rely, as CIS did, on the ground that Park was not employed full-time because he was a full-time student during the relevant period. The AAO acknowledges that "the record . . . does not reflect that the beneficiary attended school during the qualifying two-year period" and that "the petitioner appears to have paid the beneficiary for his services during the two years immediately preceding the filing of the visa petition."

cess, its interpretation of an ambiguous regulation is controlling . . . unless 'plainly erroneous or inconsistent with the regulation.' " *Bassiri v. Xerox Corp.*, 463 F.3d 927, 930 (9th Cir. 2006) (quoting *Auer v. Robbins*, 519 U.S. 452, 461 (1997)).[3]

# I.

As a threshold matter, we consider whether the existence of some discrepancies in the materials submitted by the Church in support of its I-360 petition requires us to affirm the district court's judgment without reaching the merits of this appeal. The Church carried the burden of proof throughout the proceedings to revoke the previously granted visa petition. 8 U.S.C. § 1361; *Tongatapu Woodcraft Haw., Ltd. v. Feldman*, 736 F.2d 1305, 1308 (9th Cir. 1984). Moreover, we defer to the BIA's reasonable interpretation of § 1361, which makes "it . . . incumbent upon the petitioner to resolve the inconsistencies by independent objective evidence. Attempts to explain or reconcile the conflicting accounts, absent competent objective evidence pointing to where the truth, in fact, lies, will not suffice." *Matter of Ho*, 19 I. & N. Dec. 582, 591-92 (BIA 1988). Under appropriate circumstances, "[d]oubt cast on any aspect of the petitioner's proof *may* . . . lead to a reevaluation of the reliability and sufficiency of the remaining evidence offered in support of the visa petition." *Id.* at 591 (emphasis added).

---

[3]Contrary to the Church's contention, our analysis is not affected by the fact that this case arises out of a visa petition revocation as opposed to the initial denial of a visa petition. CIS may revoke an approved visa petition for "good and sufficient cause." 8 U.S.C. § 1155. The Bureau of Immigration Appeals ("BIA") has reasonably interpreted this statutory requirement to be satisfied if "the evidence of record at the time the decision was issued . . . warranted . . . [a] denial" of the petition. *Matter of Estime*, 19 I. & N. Dec. 450, 452 (BIA 1987). We therefore review the agency's revocation as if it were an initial denial of the Church's petition. *See Garcia-Quintero v. Gonzales*, 455 F.3d 1006, 1012-13 (9th Cir. 2006) (*Chevron* deference is appropriate when a multi-member panel of the BIA construes an immigration statute in a published disposition).

The AAO's decision in this case did not rest, however, on an adverse credibility finding based on the inconsistent records that caused it to reject the Church's other evidence. It true that the AAO noted unresolved discrepancies between the duties of the Church's choir director as listed in its weekly work schedule and the summary of those duties contained in the diagram. The AAO apparently (and properly) resolved these discrepancies against the Church, which had the burden of proof. The AAO did not state, however, that the discrepancies tainted the credibility of the other evidence, and it reached the merits of the Church's visa petition in light of that other evidence.[4] Because our review of an agency decision is limited to the reasoning articulated by the agency, *SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943), we may not now reject the entirety of the evidence submitted by the Church when the agency did not do so. We therefore reach the merits of the Church's petition and review the legal and factual sufficiency of the agency's reasoning, mindful that any inconsistency must be resolved against the petitioner. *See Matter of Ho*, 19 I. & N. Dec. at 591.

## II.

Turning to the merits of this appeal, we first consider whether the position of choir director as defined in the Church's I-360 petition and supporting materials qualifies as a "religious occupation" within the meaning of the statute. By statute, up to 5000 permanent resident visas are set aside every year for "special immigrant" religious workers other than ministers. 8 U.S.C. § 1153(b)(4). A "special immigrant," as that classification pertains to ministers and other religious workers, is defined as:

---

[4]We need not decide whether it would be *per se* "arbitrary" or "capricious" for the agency to indulge in such "*falsum in unum, falsum in omnibus*" fact-finding prerogative without providing an opportunity for a hearing. 5 U.S.C. § 706(2)(A).

[A]n immigrant, and the immigrant's spouse and children if accompanying or following to join the immigrant, who—

(i) for at least 2 years immediately preceding the time of application for admission, has been a member of a religious denomination having a bona fide nonprofit, religious organization in the United States;

(ii) seeks to enter the United States—

(I) solely for the purpose of carrying on the vocation of a minister of that religious denomination,

(II) before October 1, 2008, in order to work for the organization at the request of the organization in a professional capacity in a religious vocation or occupation, or

(III) before October 1, 2008, in order to work for the organization (or for a bona fide organization which is affiliated with the religious denomination and is exempt from taxation as an organization described in section 501(c)(3) of Title 26) at the request of the organization in a religious vocation or occupation; and,

(iii) has been carrying on such vocation, professional work, or other work continuously for at least the 2-year period described in clause (i);

8 U.S.C. § 1101(a)(27)(C). The implementing regulation defines the key term "religious occupation" as follows:

Religious occupation means an activity which relates to a traditional religious function. Examples

of individuals in religious occupations include, but are not limited to, liturgical workers, religious instructors, religious counselors, cantors, catechists, workers in religious hospitals or religious health care facilities, missionaries, religious translators, or religious broadcasters. This group does not include janitors, maintenance workers, clerks, fund raisers, or persons solely involved in the solicitation of donations.

8 C.F.R. § 204.5(m)(2). Following CIS' interpretation of the term "religious occupation," the AAO required that *all* duties proposed by the Church be related to the position of choir director and not be primarily secular in nature. It also required a showing that the position of choir director must have been "*traditionally* a permanent, full-time, salaried occupation within the denomination." (Emphasis added).[5] We consider and reject each ruling in turn.

## A.

We first address whether the AAO decision can be affirmed because the weekly work schedule does not establish that "*all* the duties listed [therein] are related to the position of choir director and are not primarily secular in nature." (Emphasis added). We conclude that the standard imposed by the AAO —namely, that *all* the duties of a proposed position must be "not primarily secular in nature" and must be "related" to religious activities—is inconsistent with the definition of "reli-

---

[5]In its decision, the AAO articulated two additional grounds for dismissing the Church's appeal—namely, the supposed absence of evidence in the record that the position of choir director is directly related to the Church's religious creed and that the position is defined and recognized by the governing body of its denomination. At oral argument, counsel for the government conceded that neither of these findings is supported by substantial evidence. We therefore reject these rulings for lack of a factual basis, and do not address the validity of the legal standards they employ.

gious occupation" set forth in the regulation, 8 C.F.R. § 204.5(m)(2).

**[1]** Although the agency's interpretation of 8 C.F.R. § 204.5(m)(2) presents a question of first impression in this Circuit, we find guidance in the approach adopted by the Third Circuit in a similar case, *Soltane v. U.S. Dept. of Justice*, 381 F.3d 143 (3d Cir. 2004). In *Soltane*, then-Judge Alito explained that the regulation's specific exclusion of certain workers "who perform *wholly* secular functions" does "not mean that a person cannot qualify as having a 'religious occupation' if the worker's job includes *both* secular and religious aspects." *Id.* at 150. The court noted that the commentary to the regulation supported the exclusion of some occupations on the ground that "[i]f [a] job has *no religious significance*, then the fact that a person is a member of a religious denomination working in a facility run by the denomination would not by itself make that person a religious worker." *Id.* (quoting 56 Fed. Reg. 66,965 (Dec. 27, 1991) (emphasis added)). It concluded, however, that "[t]o the extent that the AAO read[s] § 204.5(m)(2) as requiring that a 'religious occupation' involve *only* religious functions, . . . its interpretation is inconsistent with the text of the regulation and other indications of the agency's intent and is accordingly not entitled to deference." *Id.*

**[2]** We join the Third Circuit in rejecting an interpretation of 8 C.F.R. § 204.5(m)(2) that would require *each discrete* duty of a qualifying religious occupation to be primarily nonsecular and directly related to core religious activity. The regulation provides illustrative "[e]xamples" of several qualifying positions—"liturgical workers, religious instructors, religious counselors, cantors, catechists, workers in religious hospitals or religious health care facilities, missionaries, religious translators, or religious broadcasters"—as well as some that do not qualify—"janitors, maintenance workers, clerks, fund raisers, or persons *solely* involved in the solicitation of donations." 8 C.F.R. § 204.5(m)(2) (emphasis added). The

feature that distinguishes the first group from the second is not that *each discrete* duty in a qualifying worker's daily routine is religious, "not primarily secular" or directly related to an exclusively religious activity, as the AAO required in this case. "It is difficult to imagine *any* position with any religious organization that would not involve a small amount of administrative duties." *Perez v. Ashcroft*, 236 F. Supp. 2d 899, 904 (N.D. Ill. 2002). Rather, the unifying feature of the enumerated qualifying occupations is that they carry a quantum of religious significance. *Soltane*, 381 F.3d at 150. We therefore cannot affirm the AAO decision simply because not *all* the duties of choir director as described in the work schedule are primarily non-secular and related to core religious activities.

**[3]** Having rejected the AAO's interpretation of 8 C.F.R. § 204.5(m)(2), we decline to adopt in the first instance our own characterization of the quantum of religious activity that a proposed position must include to qualify under 8 C.F.R. § 204.5(m)(2). The regulation defines the key phrase "religious occupation" as "an activity which relates to a traditional religious function." *Id.* Although the AAO's current interpretation of this phrase is impermissibly restrictive, we recognize that the regulation's language is sufficiently broad to admit of more than one interpretation. Moreover, we are fully cognizant that no more than 5000 aliens may be admitted each year as permanent residents pursuant to the religious worker "special immigrant" classification.[6] 8 U.S.C. § 1153(b)(4). We accordingly leave it to the agency to decide, in the first instance and on the basis of its expertise, *see INS v. Ventura*, 537 U.S. 12, 16-17 (2002), whether an occupation that has merely "*some* religious significance" suffices under the statute, *Soltane*, 381 F.3d at 150, or whether some greater level is required: for example, that the occupation must be *substantially* or even *primarily* comprised of religious duties.

---

[6]Religious workers "seek[ing] to enter the United States . . . *solely* for the purpose of carrying on the vocation of a *minister* of [a] religious denomination" are not subject to the 5000 visas per year limitation. 8 U.S.C. § 1101(a)(27)(C)(ii)(I) (emphases added); 8 U.S.C. § 1153(b)(4).

**B.**

We next consider whether the AAO's decision can be affirmed because the position of choir director had not "traditionally [been] a permanent, full-time, salaried occupation within the denomination." We conclude that, by requiring the Church to show that it has *traditionally* employed a permanent, full-time, and salaried choir director, the AAO imposed a standard that is inconsistent with the controlling regulation.

**[4]** The implementing regulation, 8 C.F.R. § 204.5(m)(2), adopts the term "traditional religious function" to define the type of employment that may qualify as a "religious occupation" under the statute. It does not, however, shed light on what constitutes such a "traditional religious function"; it merely provides a few examples of qualifying (and non-qualifying) positions. Accordingly, we recognize that there is a threshold ambiguity as to the correct interpretation of the term. *See Bassiri*, 463 F.3d at 930.

**[5]** In filling this vacuum, however, the agency has imposed a standard that is inconsistent with the regulation it purported to interpret. *See id.* In illustrating what may constitute a qualifying "traditional religious function," 8 C.F.R. § 204.5(m)(2) provides examples of distinct roles and activities performed by workers within certain religious denominations. It does not, however, impose any requirement that such positions have been filled in the same manner for any durational period. CIS has unduly focused on the labor history of the institution filing the petition as opposed to the type of work described in the petition. This focus is irreconcilable with the meaning and structure of 8 C.F.R. § 204.5(m)(2). That a growing church has moved from a volunteer to a paid worker for a traditional religious function does not change the traditional religious nature of the work as set forth in the regulatory examples.

This is not an instance in which the regulations are drawn in broad terms and implicitly delegate authority to develop

additional requirements to the adjudicative body. Although 8 C.F.R. § 204.5(m)(2) is itself ambiguous, the following subsections, 8 C.F.R. § 204.5(m)(3)-(4), spell out in detail what a petitioner must disclose about the proposed "religious occupation":

> (3) Initial evidence. Unless otherwise specified, each petition for a religious worker must be accompanied by [e]vidence that the organization qualifies as a nonprofit organization . . . and . . . [a] letter from an authorized official of the religious organization in the United States which . . . establishes . . . [t]hat, if the alien is to work in another religious vocation or occupation, he or she is qualified in the religious vocation or occupation. Evidence of such qualifications may include, but need not be limited to, evidence establishing that the alien is a nun, monk, or religious brother, or that the type of work to be done relates to a traditional religious function.

> . . .

> (4) Job offer. The letter from the authorized official of the religious organization in the United States must also state . . . how the alien will be paid or remunerated if the alien will work in a professional religious capacity or in other religious work. The documentation should clearly indicate that the alien will not be solely dependent on supplemental employment or solicitation of funds for support. In doubtful cases, additional evidence such as bank letters, recent audits, church membership figures, and/or the number of individuals currently receiving compensation may be requested.

8 C.F.R. § 204.5(m)(3)-(4). If the agency intended to impose a denomination's payroll history as a threshold requirement, we have little doubt that such records would have been

included among the detailed substantive and evidentiary requirements set forth in § 204.5(m)(3)-(4). They were not. It was therefore unreasonable for the agency to read such a requirement into 8 C.F.R. § 204.5(m)(2).[7]

* * *

**[6]** In sum, CIS' interpretation of § 204.5(m)(2) was unreasonable with respect to both the requirements that the AAO found unsatisfied in this case: (1) that "*all* of the duties listed [in the petition be] related to the position of choir director and . . . not primarily secular in nature," (emphasis added), and (2) that the Church must have *traditionally* employed a permanent, full-time, and salaried choir director.

## III.

The AAO also dismissed the Church's appeal because the Church had failed to establish that Park had "been carrying on such vocation, professional work, or other work [as that described in the proposed position] continuously for at least the 2-year period [immediately preceding the time of application for admission]." 8 U.S.C. § 1101(a)(27)(C)(iii). The agency concluded that the Church had not satisfied this requirement because "the evidence does not establish that [Park] was working full time as a choir director"—i.e., the proposed position—during the relevant two-year period. In particular, the AAO pointed to the weekly work schedule, which indicated "at most[ ] 13 hours per week in music related activity."

---

[7]It is of course true that "[i]n appropriate cases, [CIS] may request appropriate additional evidence relating to the eligibility under section 203(b)(4) of the Act of the religious organization, the alien, or the affiliated organization." 8 C.F.R. § 204.5(m)(3)(iv). This provision, however, does not authorize CIS to impose, as it did here, additional threshold requirements that are "plainly erroneous or inconsistent with the regulation[s]." *Bassiri*, 463 F.3d at 930 (internal quotation marks and citation omitted).

**[7]** We cannot affirm the AAO's decision on this ground. The AAO did not find that Park was not a full-time, salaried employee of the Church during the relevant two-year period —a conclusion that would be squarely contradicted by the record. Quite differently, it concluded that not enough of the full-time, salaried work performed by Park was actually related to music. This approach is contrary to the statute in two respects. First, although the Church did label the proposed position as "choir director," music is not necessarily the only activity of religious significance in the proposed position. To the extent that other duties identified in the proposed position and unrelated to music carried religious significance, the salaried time spent by Park engaging in those activities during the relevant two-year period must be credited towards the required full-time and salaried experience. For example, by focusing exclusively on music, the AAO apparently excluded from its calculus several hours dedicated every week to "prayer"—presumably as religious an activity as one can imagine. If prayer is a duty under the Church's choir director position and Park engaged in prayer as part of his salaried employment during the relevant two-year period, that time was clearly spent in "such work" as that for which the Church seeks the "special immigrant" classification. 8 U.S.C. § 1101(a)(27)(C)(iii). Accordingly, it must be credited in assessing the full-time nature of Park's experience.

**[8]** Moreover, the statute requires two years of experience in "*such work*" as that of the proposed "religious occupation." 8 U.S.C. § 1101(a)(27)(C)(iii) (emphasis added). As we have already explained, however, § 204.5(m)(2), which defines the key phrase "religious occupation," does not require that *every* duty of a qualifying position be religious in nature or related to religious activities. It follows, then, that the two-year experience requirement may similarly be satisfied even if not every work-related duty in which the beneficiary engaged during the relevant two-year period was religious in character. If, for example, the agency on remand should adopt the Third Circuit's standard requiring only "*some* religious signifi-

cance," *Soltane*, 381 F.3d at 150, and should conclude that the Church's choir director position does have "some religious significance," *id.*, then Park would appear to satisfy the experience requirement announced in § 1101(a)(27)(C)(iii). Because, as the case is presented to us, the AAO's decision does not foreclose this possibility, we cannot affirm its dismissal of the Church's appeal on the ground that it failed to satisfy the two-year experience requirement pursuant to 8 U.S.C. § 1101(a)(27)(C)(iii).[8]

## CONCLUSION

[9] The AAO's dismissal of the Church's appeal rests on an interpretation of 8 C.F.R. § 204.5(m)(2) that is inconsistent with the regulation and on factual findings that are unsupported by substantial evidence. Reconsideration of the AAO's regulatory interpretation also requires reconsideration of its application of the two-year experience requirement set forth in 8 U.S.C. § 1101(a)(27)(C)(iii). Accordingly, we reverse the judgment of the district court, and vacate the AAO's decision. We remand the matter to the district court with instructions to remand it to the agency for further proceedings consistent with this opinion.

---

[8]The AAO's decision does not suggest that Park was not a full-time, salaried employee of the Church during the relevant two-year period. Accordingly, we need not reach the separate requirement imposed by the agency that the beneficiary's two-year experience in the relevant religious occupation be accrued in the context of a full-time and salaried employment relationship. *See, e.g.*, *Haw. Saeronam Presbyterian Church v. Ziglar*, 243 Fed. Appx 224, 226 (9th Cir. 2007) (unpublished opinion) (according *Chevron* deference to a BIA published decision holding that religious workers are "continuously" employed in a religious occupation for two years as required by § 1101(a)(27)(C)(iii) only if they are employed full time). As our decision makes clear, the inquiry whether a beneficiary is employed full time and receives a salary for his services during the relevant two-year period is independent of the question whether his *duties* during that time period qualify as work such as that described in the asserted "religious occupation."

**REVERSED AND REMANDED, WITH INSTRUC-TIONS.**