# WHETHER BILLS MAY BE PRESENTED BY CONGRESS AND RETURNED BY THE PRESIDENT BY ELECTRONIC MEANS

*The use of electronic means of presentment and return of bills is constitutionally permissible.*

*The statutes governing the presentment process could be read as encompassing electronic transmission, but that is not necessarily the most natural reading. In light of the novelty of electronic presentment and return, and the need to ensure that the President and Congress—as well as the public— share a common understanding of the means by which these fundamental steps in the lawmaking process may be carried out, we recommend that, before electronic presentment and return might be used, 1 U.S.C. §§ 106, 106a, and 107 be amended to provide expressly for the permissibility of electronic presentment and that the President and Congress reach an agreement, whether by statute or other means, concerning the permissibility of electronic return of bills.*

May 3, 2011

## MEMORANDUM OPINION FOR THE COUNSEL TO THE PRESIDENT

The second paragraph of Article I, Section 7 of the Constitution sets out the requirements of bicameralism and presentment that define how a bill becomes a law and the two ways in which a bill presented to the President may fail to become a law, including by the President's return of the bill to the originating chamber of Congress with his objections. It provides:

> Every Bill which shall have passed the House of Representatives and the Senate, shall, before it becomes a Law, be presented to the President of the United States; If he approve he shall sign it, but if not he shall return it, with his Objections to that House in which it shall have originated, who shall enter the Objections at large on their Journal, and proceed to reconsider it. If after such Reconsideration two thirds of that House shall agree to pass the Bill, it shall be sent, together with the Objections, to the other House, by which it shall likewise be reconsidered, and if approved by two thirds of that House, it shall become a Law. But in all such Cases the Votes of both Houses shall be determined by Yeas and Nays, and the Names of the Persons voting for and against the Bill shall be entered on the Journal of each House respectively. If any Bill shall not be returned by the President within ten Days (Sundays excepted) after it shall have been presented to him, the Same shall be a Law, in like Manner as if he had signed it, unless the Congress by their Adjournment prevent its Return, in which Case it shall not be a Law.

You have asked whether it would be legally permissible for Congress to present bills to the President, and for the President to return bills to Congress when he disapproves them, in electronic rather than paper form. We understand that the White House Executive Clerk and his counterparts in the House and Senate are considering establishing a system for secure electronic transmission of bills for use in emergencies.

We believe that use of electronic means of presentment and return are permitted by the Constitution. As far as we are aware, the terms "presented" and "return" as used in Article I, Section 7 are not terms of art but rather take their meanings by reference to common usage. Nothing in their usual meanings excludes transmission by electronic means. Nor is electronic transmission inconsistent with the purposes of presentment and return. And historical practice confirms that Congress and the President have long adopted a pragmatic approach to such logistical matters, an approach that allows for some flexibility and revision in light of technological developments and special circumstances.

The presentment process is also governed by statute. Currently, 1 U.S.C. §§ 106 and 107 generally require that an enrolled bill, that is, one that has passed both chambers of Congress, be printed on parchment or paper "of suitable quality" and "sent" to the President. 1 U.S.C. §§ 106 & 107. We think those statutory directives could be read as encompassing electronic transmission, but that is not necessarily the most natural reading. In light of the novelty of electronic presentment and return, and the need to ensure that the President and Congress—as well as the public—share a common understanding of the means by which these fundamental steps in the lawmaking process may be carried out, we recommend that, before electronic presentment and return might be used, 1 U.S.C. §§ 106, 106a, and 107 be amended to provide expressly for the permissibility of electronic presentment and that the President and Congress reach an agreement, whether by statute or other means, concerning the permissibility of electronic return of bills.

**I**

The Constitution does not specify the form in which or the means by which Congress must present a bill to the President for his consideration or the President must return a bill to Congress when he disapproves it. Rather, the Constitution outlines the decisional process by which Congress and the President may enact a bill into law and the methods by which the President may veto a bill. Once both houses of Congress have approved a bill, it must be "presented" to the President. U.S. Const. art. I, § 7. If he disapproves the bill, he must "return" "it" to the originating chamber with his objections. *Id*. No doubt those who drafted and ratified the Constitution, living long before the era of facsimile machines and portable document format (".pdf") files, expected that the required presentment and return would be accomplished through physical delivery of documents. But we see no reason to read Article I, Section 7 as excluding electronic means of transmission.

**A**

When a term in the Constitution had a well-established meaning in the common law at the time of the founding, that meaning may provide a helpful tool in interpreting the term, *see, e.g.*, *Crawford v. Washington*, 541 U.S. 36, 54 (2004) (holding that the constitutional right of the accused "'to be confronted with the witnesses against him,' Amdt. 6, is most naturally read as a reference to the right of confrontation at common law, admitting only those exceptions established at the time of the founding"), and we have resorted to contemporaneous common-law usage in interpreting the requirement in Article I, Section 7 that the President "sign" a bill when he approves its adoption into law, *see* Memorandum for Harriet Miers, Counsel to the President, from Howard C. Nielson, Jr., Deputy Assistant Attorney General, Office of Legal Counsel, *Re:*

*Whether the President May Sign a Bill by Directing that His Signature Be Affixed to It* at 2-12 (July 7, 2005), *available at* www.usdoj.gov/olc/opinions.htm ("Nielson Memo"). But as far as we are aware, "presented" and "return" are not, at least as used in Article I, Section 7, terms drawn from the common law.[1] Thus, we look initially to their meanings in ordinary usage. *See, e.g.*, *United States v. Sprague*, 282 U.S. 716, 731 (1931) ("[t]he Constitution was written to be understood by the voters; its words and phrases were used in their normal and ordinary as distinguished from technical meaning").

Both terms connote delivery to a particular recipient. To "present," according to Noah Webster's dictionary, means "[t]o set, place or introduce into the presence" of someone, "[t]o put into the hands of another," "[t]o lay before a public body for consideration." 2 Noah Webster, *An American Dictionary of the English Language* 41-42 (photo. reprint 1967) (1828). The *Oxford English Dictionary*, which looks back to examples from the time of the Constitution's adoption and earlier, similarly defines the verb "present" as simply "[t]o make present to, bring into the presence of." 12 *Oxford English Dictionary* 396 (2d ed. 1989). Other modern-day dictionaries give similar definitions.[2] The word "return" has an equally general meaning. According to Webster, "to return" means "[t]o bring, carry, or send back." 2 Webster, *An American Dictionary of the English Language* at 57. Other dictionaries are in accord.[3] These definitions suggest transmission back and forth, but they are easily broad enough to encompass transmission by electronic means.

Article I, Section 7 does provide that it must be the "[b]ill" approved by Congress that is presented to the President and either signed by him if he approves "it" or returned by him if he disapproves "it." The generation that wrote and adopted the Constitution no doubt understood legislative "bills" to be physical documents. But we do not think that term limits Congress only

---

[1] The term "present" was used then, as it is today as well, in reference to negotiable instruments. *See, e.g.*, Joseph Story, *Commentaries on the Law of Bills of Exchange, Foreign and Inland, as Administered in England and America; with Occasional Illustrations from the Commercial Law of the Nations of Continental Europe* ch. 8 (3d ed. 1853) (discussing "presentment of bills for acceptance"); Joseph Chitty, *A Treatise on the Law of Bills of Exchange, Checks on Bankers, Promissory Notes, Bankers' Cash Notes, and Bank-Notes* ch. 4 (1803) (same). It also was known in criminal law. When a grand jury approves an indictment, it may be said to "present" a "true bill." *See, e.g.*, 2 *An American Dictionary of the English Language* 42 (photo. reprint 1967) (1828) ("it is the duty of grand juries to *present* all breaches of law within their knowledge"). We do not think the uses of the term "present" in these contexts sheds any light on the question we address about its meaning in the different context of the legislative process. But in any event, these different uses are all consistent with what the *Oxford English Dictionary* records as a more general legal meaning of "present," namely, "[t]o bring or lay before a court, magistrate, or person in authority, for consideration or trial; to make presentment of," 12 *Oxford English Dictionary* 397 (2d ed. 1989), a meaning consistent with our interpretation of the term in Article I, Section 7.

[2] *See Webster's Third New International Dictionary* 1793 (1986) ("to bring or introduce into the presence of someone"); *The Random House Dictionary of the English Language* 1529 (2d ed. 1987) ("to bring, offer, or give, often in a formal or ceremonious way"); *The American Heritage Dictionary of the English Language* 1388 (4th ed. 2006) ("[t]o offer for observation, examination, or consideration").

[3] *See* 13 *Oxford English Dictionary* at 805-06 ("[t]o give or render back (*to* one)"); *Webster's Third New International Dictionary* at 1941 ("to pass back to an earlier possessor"); *The Random House Dictionary of the English Language* at 1645 ("to put, bring, take, give, or send back to the original place, position, etc."); *The American Heritage Dictionary of the English Language* at 1490 ("[t]o send, put, or carry back").

to the presentment to the President of a paper document with original signatures.[4] We have in the past advised that this provision requires the President to sign the enrolled bill actually signed by the presiding officers of the House and Senate. *See* Memorandum to the Files from Ralph W. Tarr, Deputy Assistant Attorney General, Office of Legal Counsel, *Re: Presidential Signing of Bankruptcy Extension Act* at 10-11 (June 13, 1984) ("[t]he Constitution appears to require that the President sign the actual enrolled bill presented to him, not a copy or facsimile thereof") ("Tarr Memo"); *see also* Memorandum to the Files from Jeffrey P. Singdahlsen, Attorney-Adviser, Office of Legal Counsel, *Re: Preliminary Advice and Consideration Regarding Proposal to Fax Continuing Resolution to the President While He Was Abroad* at 1-2 (Dec. 22, 1999) ("Singdahlsen Memo"). We did so in part based on the provision's wording and in part based on the unbroken practice of presenting the copy actually signed by the presiding officers.

The wording of the provision indicates that the President must sign or return what Congress presents and that Congress must present the precise text approved by its two chambers, but we think the Constitution leaves to Congress to determine the specific physical manifestation of the legislative text that it will present to the President. As a bill moves through Congress, it takes many forms and appears in many copies. Since the beginning of our government under the Constitution, as described below, Congress has regulated, by rule and statute, how the text of bills must be prepared and certified. Those congressional directives would have been unnecessary if the Constitution itself dictated the form presented bills must take. And on a number of occasions, also described below, when the certified copies of enrolled bills presented to the President have been lost, the President and Congress have not begun the legislative process again but have simply authorized the issuance of duplicate copies for re-transmission to the President, again suggesting that the Constitution leaves to the political branches the determination of the precise mechanisms by which presentment and return are accomplished.[5] It is true that the consistent practice of Congress from the beginning has been to present to the President the document actually signed by its presiding officers. That longstanding practice perhaps counsels caution in resort to other methods. But we think it reflects practical considerations rather than considered judgments about what the Constitution requires.[6]

---

[4] Noah Webster's dictionary defines "bill" as "[a] form or draft of a law, presented to a legislature, but not enacted." 1 *An American Dictionary of the English Language* at 27. "In some cases," it notes, "*statutes* are called *bills*." *Id*. The Oxford English Dictionary similarly defines "bill" as "[t]he draft of an Act of Parliament submitted to the legislature for discussion and adoption as an 'Act.'" 2 *Oxford English Dictionary* at 191; *see also Webster's Third New International Dictionary* at 215 ("a draft of a law presented to a legislature for enactment"); *The Random House Dictionary of the English Language* at 207 ("a form or draft of a proposed statute presented to a legislature but not yet enacted or passed and made law "); *The American Heritage Dictionary of the English Language* at 180 ("[a] draft of a proposed law presented for approval to a legislative body ").

[5] If any additional textual warrant were required, the Necessary and Proper Clause, with its sweeping grant to Congress of the power to "make all laws which shall be necessary and proper for carrying into execution" the other powers vested in itself or in any other part of the federal government, stands as further support for the proposition that the Constitution leaves to the political branches the manner by which Congress and the President fulfill the requirements of presentment and return. *See* U.S. Const. art. I, § 8 ("The Congress shall have Power . . . [t]o make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers, and all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof.").

[6] The Supreme Court has cautioned that "an unbroken practice . . . is not something lightly to be cast aside." *Walz v. Tax Comm'n of City of New York*, 397 U.S. 664, 678 (1970). But it has done so in avoiding reading

*Cf*. Nielson Memo at 26 ("the historical practice should be viewed not as rejecting the position we adopt today, but rather as simply reflecting the practical reality that for much of our Nation's history the President was precluded by circumstance and technological limitations from approving and signing a bill that had not been physically delivered to him"). The Constitution's sparse text, we believe, leaves these determinations to the political branches. As the Supreme Court has explained in a different context:

> The fact that an instrument drawn with such meticulous care and by men who so well understood how to make language fit their thought does not contain any such limiting phrase affecting the exercise of discretion by the Congress in choosing one or the other alternative mode . . . is persuasive evidence that no qualification was intended.

*Sprague*, 282 U.S. at 732.[7]

**B**

The purposes of the presentment and return requirements of Article I, Section 7, as we understand them, also seem consistent with interpreting that provision to permit electronic transmission. *See, e.g.*, *Edwards v. United States*, 286 U.S. 482, 485-86 (1932) (interpreting last sentence of the second paragraph of Article I, Section 7 in light of its "controlling purposes"). The basic purpose of the presentment requirement is to ensure the President receives a prompt and full opportunity to fulfill his constitutional duty to consider bills and determine whether to approve them or not. *See The Pocket Veto Case*, 279 U.S. 655, 676-77 (1929) ("The Constitution in giving the President a qualified negative over legislation—commonly called a veto—entrusts him with an authority and imposes upon him an obligation that are of the highest importance, in the execution of which it is made his duty not only to sign bills that he approves in order that they may become law, but to return bills that he disapproves, with his objections, in order that they may be reconsidered by Congress."). The basic purpose of the return requirement is to ensure that Congress receives a prompt and full opportunity to reconsider a bill that has been vetoed by the President. *See id*. Both those purposes will be advanced by allowing electronic transmission when circumstances require it. Denying the permissibility of electronic

---

constitutional provisions as prohibiting long-established practices. *See id*. (rejecting First Amendment challenge to State tax exemption for religious organizations for properties used solely for religious purposes); *Marsh v. Chambers*, 463 U.S. 783, 790 (1983) (rejecting First Amendment challenge to State legislature's practice of opening sessions with religious prayer led by State-paid chaplain); *Jackman v. Rosenbaum Co*., 260 U.S. 22, 31 (1922) (rejecting 14th Amendment challenge to local law). Our interpretation of Article I, Section 7 does not "cast aside" a longstanding practice in this sense. Far from interpreting a constitutional provision as prohibiting any particular established practice, we interpret it as permitting both longstanding practices and novel ones by leaving some measure of discretion, and thus some room for logistical innovation, in the hands of the political branches.

[7] We are unaware of anything in the history of the drafting or ratification of the Constitution that sheds any light on the issue addressed here, though there was considerable discussion about whether the President should be given a veto and, if so, what kind. For brief summaries of the progress of what became Article I, Section 7 during the Constitutional Convention, see Edward C. Mason, *The Veto Power: Its Origin, Development and Function in the Government of the United States* 20-22 (1890); Jaynie Randall, *Sundays Excepted*, 59 Ala. L. Rev. 507, 512-13 (2008).

transmission, by contrast, would frustrate those purposes when an emergency might make electronic transmission the only feasible method of ensuring the prompt enactment of a law or the prompt conveying of a presidential veto and thus the ensuring of a prompt opportunity for Congress to consider an override.

**C**

Historical practice in both the Executive and Legislative Branches confirms the appropriateness of an interpretation of Article I, Section 7 that permits the political branches to take advantage of improvements in communications technology in the manner in which they record and transmit bills. Since the adoption of the Constitution, Congress and the President have reached practical accommodations concerning the manner of presentment and return, allowing clerks to deliver and receive bills on behalf of each branch, including when Congress is out of session or the President is away from the White House. This Office has also opined that the President may use means besides signing his own full name in ink in order to "sign" a bill within the meaning of the Constitution—including inscription of initials, inscription by a subordinate, and use of an autopen. On occasions when Congress or the President has lost an enrolled bill prior to enactment, they have used a duplicate to complete the process of enactment, without starting over and re-introducing a new version of the bill and having it re-approved by each chamber of Congress. Congress has used rules, parliamentary precedents, and most recently statutes to determine the process by which bills will be recorded and transmitted. It has adapted this process over time to improve accuracy and efficiency. At no point in this evolution are we aware of any suggestion, judicial or otherwise, that the Constitution forecloses such adaptations.

**1**

Strict attention to the core requirement of personal presidential decisionmaking combined with a pragmatic approach to the precise mechanisms by which that decisionmaking is accomplished have characterized the manner in which Presidents have met their responsibilities to receive, to approve and sign, or to veto by returning, an enrolled bill. Although Article I, Section 7 states that each bill passed by both houses of Congress shall be presented "to the President" and that the President must "sign it" or "return it," the Executive Branch has not interpreted this language as requiring the President personally to receive or return enrolled bills or as requiring the President personally to inscribe his signature on each approved bill. Congress has acquiesced in those judgments. "[T]he presentment and return requirements have been understood and applied to give the President and Congress flexibility with respect to ministerial detail so long as the essential aspects of these requirements are performed by the appropriate constitutional actors." Nielson Memo at 24. The historical precedents leave room, in our view, for the President to receive and return bills electronically.

When Congress presents a bill to the President, it does not typically place it directly in the President's hands. For at least the last century, a clerk from Congress has delivered the

enrolled print of the bill to a clerk in the White House, who signs a receipt for it.[8]  "This is not to say that the bill is not *presented* to the President within the meaning of the Constitution, but only that the ministerial process of physically accepting delivery of the bill from Congress may, if the President so directs, be carried out by a subordinate."  Nielson Memo at 21.  The receipt triggers the start of the ten-day period within which the President must either approve and sign the bill or return it to Congress, along with a statement of his reasons for not approving it (unless Congress, by its adjournment, prevents the return).  When the President is away from the White House, he will sometimes ask congressional leadership not to send enrolled bills to the White House during his absence, *see* Nielson Memo at 23-24; *The President—Constitutional Law (Article I, § 7, cl. 2)— Presentation of Enrolled Bills—Absence of the President*, 2 Op. O.L.C. 383, 383-85 (1977), or will instruct the White House clerk to accept delivery of an enrolled bill "for presentation to the President upon his return to the United States," *Eber Bros.*, 337 F.2d at 625, so as not to start the ten-day clock during a period when the President might not be able to give the bill immediate consideration.  Congress has accepted these practical accommodations to modern circumstances.

Likewise, when the President returns a bill that he has decided to veto, "the accepted practice has been for the President to return the bill by way of a messenger."  Nielson Memo at 21 (citing *Wright v. United States*, 302 U.S. 583, 590 (1938)).  "Again, it is *the President* who returns the bill even though, pursuant to the President's instructions, someone other than the President physically delivers it to Congress."  Nielson Memo at 21.  When one chamber of Congress goes out of session, it will sometimes authorize a clerk to receive bills on its behalf, so as not to prevent return and thus enable a pocket veto.  "The Supreme Court has implicitly approved this practice."  *Id.*  In addressing whether the President could return a bill to a house of Congress that has gone into recess for three days but has appointed an agent to accept bills, the Court has said that "'a rule of construction or of official action which would require in every instance the persons who constitute the Houses of Congress to be in formal session in order to receive bills from the President would also require the person who is President personally to return such bills.'"  *Wright*, 302 U.S. at 591-92 (quoting with apparent approval the Brief for Amicus Curiae Committee on the Judiciary of the House of Representatives in *The Pocket Veto Case*, 279 U.S. 655 (1929)).  Explaining that "[t]he Constitution does not define what shall constitute a return of a bill or deny the use of appropriate agencies in effecting the return," the Court held that a bill could in these circumstances be returned by delivery to an agent authorized to accept it on behalf of the originating chamber.  *Id.* at 589.  That the Constitution permits bills

---

[8]  Nielson Memo at 20 ("The presentment and return provisions have not been interpreted to require the President to receive or return a bill with his own hands."); *The President—Constitutional Law (Article I, § 7, cl. 2)— Presentation of Enrolled Bills—Absence of the President*, 2 Op. O.L.C. 383, 383 (1977) ("When the President is in the United States, presentation does not require delivery to him personally; rather it is done by delivery of the bill to one of the legislative clerks on the White House staff."); *Eber Bros. Wine & Liquor Corp. v. United States*, 337 F.2d 624, 635 (Ct. Cl. 1964) (Whitaker, J., concurring) ("[E]nrolled Bills have not been presented to the President in person, except in the case of the Bank Holiday Bill of 1933 and Bills passed on the eve of *sine die* adjournment of the Congress.  The usage has been for the Committee on Administration of either the House or the Senate, after the Bill has been signed by the Speaker of the House and the Presiding Officer of the Senate, to send a clerk to the White House with the enrolled Bill and deliver it to a legislative clerk in the records office of the White House, who signs a receipt for it.  The Committee on Administration then reports to the House or Senate 'that this day they presented to the President of the United States, for his approval, the following Bills.'"); *id.* at 631 n.15 (majority) ("Delivery to an authorized aide in the President's immediate entourage would undoubtedly be equivalent to personal delivery to the President.").

to be transmitted between the branches by messengers and through agents instead of by direct exchange between the President and the presiding officers of Congress supports the conclusion that they may also be transmitted electronically.

The Executive Branch also has interpreted the signature requirement of Article I, Section 7 not to require the President literally to take pen in hand and ascribe his full signature in ink on every bill that he approves. A contrary rule, we noted, could have the untoward effect of preventing a President with a physical disability from signing bills into law. Memorandum from William H. Rehnquist, Assistant Attorney General, Office of Legal Counsel, *Re: Delegation of the President's Authority to Physically Sign Documents* at 8 (Mar. 20, 1969) ("Rehnquist Memo") ("If the President's hands only were to become disabled so that he could not personally sign his name, obviously some other means for affixing his signature would have to be used.") (accompanying Letter for John D. Ehrlichman, Counsel to the President, from William H. Rehnquist, Assistant Attorney General, Office of Legal Counsel (Mar. 20, 1969) ("Rehnquist Letter")). In 1958, this Office advised the White House that President Eisenhower could, if he chose, inscribe his initials instead of his full signature on bills that he approved. Memorandum for Gerald D. Morgan, Special Counsel to the President, from Malcolm R. Wilkey, Assistant Attorney General, Office of Legal Counsel, *Re: Responsibility of the President to Sign Bills Passed by the House and the Senate* (Aug. 19, 1958) ("Wilkey Memo"). In 2002, we were asked whether the President, who was out of the country at the time, could direct an aide to affix his signature to a joint resolution that he wished to approve. We advised that he could. "[T]he word 'sign' is expansive enough to include the meaning of 'cause the bill to bear the President's signature.'" Memorandum for Alberto R. Gonzales, Counsel to the President, from M. Edward Whelan III, Principal Deputy Assistant Attorney General, *Re: Signing of H.J. Res. 124* at 1 (Nov. 22, 2002) ("Whelan Memo") (citing Wilkey Memo at 9 n.5); *see also Presentation of Enrolled Bills*, 2 Op. O.L.C. at 383. In 2005, we similarly advised that the President could indicate his approval of a bill "by directing a subordinate to affix the President's signature to it, for example by autopen." Nielson Memo at 1. In doing so, we examined at considerable length precedents bearing on the presentment process, and we linked our approval of signature by autopen to "the latitude traditionally exercised by Congress and the President in determining how to execute the ministerial duties associated with the presentment and return requirements." *Id*. at 22.

We also clarified that the President did not have to be physically present when a bill was signed for him at his direction, but that the President still could not delegate his constitutional signing responsibility. The President thus should be permitted to examine a copy of a bill in one part of the world and then instruct an aide at the White House to affix his signature to whatever Congress has identified as the enrolled bill and presented to the President. Nielson Memo at 18-22; Whelan Memo at 1-2.[9]

---

[9] On at least two prior occasions, in accord with our advice, the White House had flown the print of the enrolled bill it had received from Congress to the President at a location abroad, so that the President could sign the print, instead of having the President sign a faxed copy or instruct a subordinate to sign the original enrolled bill for him back in Washington, D.C.

In April 1984, President Reagan was traveling to China when Congress presented to the White House a bill to cure a constitutional infirmity in the bankruptcy court system. The President needed to sign the bill before May 1 to keep the bankruptcy courts in operation, but he was not scheduled to return to the United States until May 1. We

These precedents about presidential signature are especially instructive in that they address a word in Article I, Section 7—"sign"—which has formal as well as substantive connotations as to the actions necessary for a bill to become law. Signature is a physical rather than a mental act. It is an external manifestation of internal assent, and Article I, Section 7 plainly requires the outward manifestation in addition to the internal assent when it states: "If [the President] approve [a bill] he shall sign it."[10] An item that must be "signed" is most commonly understood to be a piece of paper, and a person typically "signs" a piece of paper in his own hand, with stylus and ink. That somebody other than the President may nevertheless "sign" a bill at his direction again suggests that there is flexibility in the external manifestation required of the President. If the President may manifest his assent by instructing an aide to sign a bill for him or by using an autopen, it is no great leap to conclude that he may manifest his assent by signing a printed copy of a bill transmitted to him electronically.

With respect to each step required of the President under Article I, Section 7, then—receipt of a presented bill and its return or signing by him—Presidents, with congressional agreement or acquiescence, have allowed themselves some logistical flexibility in how they carry out their responsibilities in order to take account of the demands of the office.

**2**

Further support for a pragmatic approach to the logistics of presentment and return comes from the several occasions on which either Congress or the President has lost the original copy of an enrolled bill and used a duplicate to complete the process of enactment. If a "bill" for purposes of Article I, Section 7 were considered to be a particular physical manifestation rather than the text of the law, the loss of a bill prior to enactment would presumably require a re-starting of the legislative process, with one of the chambers of Congress initiating consideration of a new version of the bill, engrossing it upon approval, and delivering it to the other chamber for approval and enrollment. Neither Congress nor the President, however, has insisted on such measures.

---

advised the White House that the President must himself sign the bill. *See* Tarr Memo at 9-10. The White House accordingly flew the print it had received from Congress to China, where President Reagan signed the bill into law on April 30.

In November 1999, we similarly recommended that the White House fly the original print of an enrolled continuing resolution to President Clinton in Turkey, so that he could sign the original print instead of a facsimile copy. We followed the 1984 China precedent out of an abundance of caution but raised as a question to be considered in the future whether Congress might have been able to declare the facsimile copy to be the true enrolled bill, such that the President could have signed the facsimile copy consistently with Article I, Section 7. *See* Singdahlsen Memo at 1-2.

In our 2002 and 2005 opinions, we concluded signature by the President himself had not been constitutionally compelled, but reaffirmed our longstanding position that the President's authority to sign bills was non-delegable. *See* Nielson Memo at 25-28; Whelan Memo at 1-2.

[10] *See Gardner v. Collector of Customs*, 73 U.S. (6 Wall.) 499, 506 (1867) ("The only duty required of the President by the Constitution in regard to a bill which he approves is, that he shall sign it. Nothing more. The simple signing his name at the appropriate place is *the one act which the Constitution requires of him as the evidence of his approval*, and upon his performance of this act the bill becomes law.") (emphasis added).

In February 1911, for example, the Speaker of the House signed an enrolled bill that had originated in the Senate but then lost the bill prior to presentment. The Senate passed a resolution authorizing the Secretary of the Senate to prepare a duplicate copy. The Speaker signed this duplicate copy, and it was treated as fully enrolled without any further action on the part of the Senate or the House and presented to the President.[11]

In 1935 and again in 1938, the White House lost enrolled bills that had been presented to the President but was able to obtain duplicate copies from Congress, and the President signed those duplicate bills into law. In 1935, Congress enrolled a bill authorizing a city in Alaska to issue bonds. When President Roosevelt informed Congress that the White House had lost the bill, the House and Senate issued a concurrent resolution authorizing the Speaker and the President of the Senate (the Vice President) to sign a "duplicate copy of the enrolled bill" and present it to the President.[12] In 1938, Congress enrolled a bill to extend the time for building a bridge across the Missouri River. The Senate, as the originating chamber, presented the bill to the President on May 19. On May 27, President Roosevelt sent a letter to the Senate, advising that the bill "ha[d] become lost" and requesting "that a duplicate bill be authorized."[13] That same day, the House and Senate issued a concurrent resolution authorizing the presentment of a duplicate, and the Speaker and Vice President signed the duplicate and delivered it to the President.[14] On May 31, President Roosevelt signed the duplicate into law and filed it with the Secretary of State.[15] On June 9, the White House found the original print of the enrolled bill that it had originally received from Congress. It did not matter; the bill was already law.[16] The

---

[11] VII Clarence Cannon, *Cannon's Precedents of the House of Representatives of the United States* ch. 117, § 1072 (1935).

Twice in 1921, the White House lost enrolled bills that had been presented to the President by Congress, and the bills became law because of the President's failure to return them to the originating chamber of Congress with a statement of his objections within ten days of presentment. On both occasions, President Wilson asked Congress for duplicates so he could deliver them to the Secretary of State for publication, as required by statute. Congress complied, and the bills were published as laws despite the lack of the originals. The first case involved a joint resolution to create a commission on reorganization of the administrative branch. Pub. Res. No. 66-54, 41 Stat. 1083 (Dec. 29, 1920); 60 Cong. Rec. 1086 (Jan. 7, 1921) (request by President for copy of joint resolution to file with Secretary of State); VII *Cannon's Precedents* ch. 118, § 1093. The second involved a private bill to authorize the award of a medal of honor to Chief Gunner Robert Edward Cox of the United States Navy. Priv. L. No. 66-86, 41 Stat. 1526 (Feb. 1, 1921); 60 Cong. Rec. 2539, 2552 (Feb. 3, 4, 1921) (request by President for copy of private bill to file with Secretary of State; concurrent resolution by House and Senate authorizing provision of duplicate).

[12] 7 Lewis Deschler, *Deschler's Precedents of the United States House of Representatives*, H.R. Doc. No. 94-661, ch. 24, §§ 14.20, 15.16 (1977).

[13] 83 Cong. Rec. 7601 (May 27, 1938).

[14] *Id.* at 7620.

[15] May 19, 1938, the day on which Congress presented S. 3532 to the President, was a Thursday. May 31, 1938, when President Roosevelt signed the bill, was a Tuesday, with two intervening Sundays. The President thus signed S. 3532 on the tenth day after presentment, meaning that the bill became law upon his signature and not as a result of his failure to return the bill within ten days.

[16] S. 3532 was recorded in the Statutes at Large as having become law by approval of the President on May 31. Pub. L. No. 75-556, 52 Stat. 585 ("Approved, May 31, 1938"). By contrast, when a bill became law due to the President's failure to return it within ten days, as with the two lost bills discussed above, the Secretary of State would record the date when the President received the bill from Congress and would include a notation explaining

White House accordingly retained the original for its files.[17]

In each of these cases, had the original enrolled print been considered the only true "bill," the Senate's production of a copy and the President's signature on that copy would have been constitutionally futile to enact the "bill" into law. Congress would have been required to enroll a new, identical bill and present that bill to the President. Alternatively, the original could have been considered to have become law by virtue of the President's failure to return it within ten days; upon rediscovery, the original could have been filed with the Secretary of State as evidence of its enactment. That neither Congress nor the President felt compelled to follow these alternative procedures evinces a common understanding that the language of the bill, independent of the medium of expression, is the "bill" for constitutional purposes. Consistent with this understanding, Congress should be able to create a digital image of an enrolled bill, and present it to the President in that fashion, even though the bill would then exist electronically and there would be no single physical representation of it.

**3**

Congress's establishment of different methods for engrossing and enrolling bills, partly in response to technological developments and partly in response to practical concerns for efficiency in the face of growing legislative calendars, also supports the conclusion that the Constitution does not dictate the precise mechanics by which the requirements of Article I, Section 7 are satisfied.

The first Congress agreed to a set of joint rules, modeled on English practice, which required that, "[a]fter a bill shall have passed both Houses, it shall be duly enrolled on parchment, by the Clerk of the House of Representatives, or the Secretary of the Senate, as the bill may have originated in the one or the other House, before it shall be presented to the President of the United States."[18] Being "duly enrolled on parchment" meant being written by hand. A joint Committee on Enrolled Bills—initially consisting of one Senator and two Members of the House—was responsible to check the hand-written parchment against the engrossed bills (the ones that had passed each house) and correct any errors. The Speaker of the

---

that the bill had become law by presidential inaction. *See* Pub. Res. No. 66-54, 41 Stat. 1083, 1084 (Dec. 29, 1920) ("Received by the President, December 17, 1920"; "NOTE BY THE DEPARTMENT OF STATE.—The foregoing joint resolution having been presented to the President of the United States for his approval, and not having been returned by him to the house of Congress in which it originated within the time prescribed by the Constitution of the United States, has become a law without his approval."); Priv. L. No. 66-86, 41 Stat. 1526, 1527 (Feb. 1, 1921) ("Received by the President, January 20, 1921"; "NOTE BY THE DEPARTMENT OF STATE.—The foregoing act having been presented to the President of the United States for his approval, and not having been returned by him to the house of Congress in which it originated within the time prescribed by the Constitution of the United States, has become a law without his approval.").

[17] Memorandum for the Files, from the White House (June 9, 1938) (reproduced at Appendix 1).

[18] 1 Annals of Cong. 57 (Aug. 6, 1789) (Joseph Gales ed., 1834) (Senate) ("The following joint rules, established between the two Houses, were received from the House of Representatives[.]"); *see also Jefferson's Manual of Parliamentary Practice*, H.R. Doc. No. 110-162, § 573, at 301 (2009) ("When a bill has passed both Houses of Congress, the House last acting on it notifies its passage to the other, and delivers the bill to the joint committee of enrollment, who see that it is truly enrolled in parchment.").

House and the President of the Senate would then sign the hand-written parchment, and the Committee on Enrolled Bills was responsible to ensure that the parchment was delivered to the President.[19]

These joint rules remained in place for close to a century. In the 1870s, members of Congress began to agitate for a change in the hand-enrollment process, due to its inefficiency and propensity for errors. In 1874, it came to light that during the process of enacting an important tariff bill two years earlier, someone had made a critical punctuation error in recording a Senate amendment.[20] During debate over the source of this error, Senator Sumner proposed that Congress consider following the lead of the English Parliament, which in 1849 had begun printing its enrolled bills on regular paper, instead of recording them by hand on parchment.[21] Nearly twenty years later, in 1893, a joint commission of three Representatives and three Senators—appointed to "inquire into the status of the laws organizing the Executive Departments of the Government"—issued a report repeating Senator Sumner's recommendation that the process of hand enrollment be discontinued and that enrolled bills be printed and presented in print to the President.[22]

This proposal prompted considerable deliberation in both houses of Congress, which reveals a common understanding on the part of members at the time that they had the constitutional flexibility to devise the most effective means of recording enrolled bills and transmitting them to the President. Members on both sides of the debate expressed practical, not legal, concerns. The primary argument in favor of changing from hand to print enrollment was eliminating scrivener's errors. "The manuscript copy of a bill is not always in the best handwriting," noted one Representative who had served on the joint commission, "and errors are

---

[19] *Id.*; *see also* IV Asher C. Hinds, *Hinds' Precedents of the House of Representatives of the United States* chs. 91-93 (1907) ("*Hinds' Precedents*"); J.A.C. Grant, *Judicial Control of the Legislative Process: The Federal Rule*, 3 W. Pol. Q. 364, 365-69 (1950).

[20] A Florida Senator had proposed to include on a list of tariff-free items in the 1872 bill the following: "fruit-plants, tropical and semi-tropical." The Senate approved this amendment, but the engrossed bill that went from the Senate to the House omitted the first hyphen: "fruit plants, tropical and semi-tropical." By the time the bill was introduced in the House, someone had inserted a comma and pluralized "fruit"—"fruits, plants, tropical and semi-tropical"—and the bill was ultimately enrolled and signed by the President in this form. The effect was thus to eliminate tariffs not just on "fruit-plants" but on all "fruits" and all "plants, tropical and semi-tropical," causing the loss of an estimated "half a million dollars of revenue" in two years. Senators could not agree on whether these changes had been made inadvertently or intentionally in bad faith. 2 Cong. Rec. 1663 (Feb. 20, 1874); *see also Legislative, Executive, and Judicial Appropriation Bill: Hearings on H.R. 8767 Before Subcomm. of H. Comm. on Appropriations*, 53d Cong. 60 (1895) (enclosing letter from Acting Secretary of Treasury recounting fruit-plant controversy).

[21] *See* 2 Cong. Rec. 1664 (Feb. 20, 1874) ("The Congress of the United States and the Commonwealth of Massachusetts are the only two legislative bodies, I believe, now in the world that adhere to the old system of parchment in the last stage of the bill. We borrowed it from England; but the English have seen that it was not advisable to trust their statutes to a written roll, as they had done for generations; and now, at the last stage, and when the measure receives the assent of the Crown, it is always in print; . . . Now I think it would be well for Congress to follow in that channel. We followed it originally in adopting parchment; I would follow it now in adopting print."); *see also* IV *Hinds' Precedents* § 3437.

[22] 25 Cong. Rec. 2858-59 (Oct. 26, 1893) (House); *id.* at 3039 (Nov. 1, 1893) (Senate).

very liable to creep in and to go undiscovered."[23] The commission had surveyed the practices of European parliaments and state legislatures, and it presented concrete examples of printed bills and resolutions from England to illustrate the advantages in readability and accuracy afforded by printing engrossed and enrolled bills.[24] A member from Maine reported that the Maine Legislature had cut costs by 25% in moving from hand-written to printed enrollment and projected that Congress would save the same amount.[25]

The primary concern expressed in opposition to the proposed change arose from the rush to enroll lengthy appropriations bills that often occurred at the end of a session of Congress. Some members were worried that there might not be time to print, enroll, and present a bill to the President if the bill were passed shortly before adjournment.[26] In response, members of the commission emphasized that the move to printing enrolled bills was "an experiment"; "[w]e do not propose to burn our bridges behind us so that we can not go back to another process if it be desirable to do so."[27]

In the end, both houses of Congress passed a concurrent resolution requiring that engrossed and enrolled bills be printed on parchment.[28] In February 1895, Congress passed another concurrent resolution allowing for hand enrollment during the last six days of a session "when in the judgment of the Joint Committee on Printing it is deemed necessary."[29] Less than a month later, Congress put both of these principles into a statute.[30] In 1920, Congress authorized

---

[23] *Id.* at 2859 (Oct. 26, 1893) (statement of Rep. James D. Richardson); *see also id.* ("It is so much easier to detect an error in plain print than in manuscript . . . .").

[24] *See id.* at 2859-60 (Oct. 26, 1893) (House); *id.* at 3039-40 (Nov. 1, 1893) (Senate). "[T]here is not a civilized government in the world, except the United States," asserted one Representative, "which employs the present system of enrolling bills by the pen." *Id.* at 2861 (Oct. 26, 1893) (statement of Rep. Alex M. Dockery).

[25] *Id.* at 2860 (Oct. 26, 1893) (statement of Rep. Nelson Dingley, Jr.).

[26] *Id.* at 2859, 2861 (House) (Oct. 26, 1893); 25 Cong. Rec. 3040 (Senate) (Nov. 1, 1893).

[27] *Id.* at 2861 (Oct. 26, 1893) (statement of Rep. James Richardson); *see also id.* at 3040 (Nov. 1, 1893) (statement of Sen. F.M. Cockrell) ("This is only a concurrent resolution, and we can amend it in ten minutes at any time we wish to . . . .").

[28] *See id.* at 2858-61 (Oct. 26, 1893) (House); *id.* at 3039-40, 3067-68 (Nov. 1, 1893) (Senate); IV *Hinds' Precedents* § 3433.

[29] IV *Hinds' Precedents* § 3434; *see* 27 Cong. Rec. 2012 (Feb. 11, 1895) (statement of Sen. Arthur P. Gorman) (proposing concurrent resolution "[t]hat, during the last *ten* days of any session of Congress the engrossing and enrolling of bills and joint resolutions by printing, as provided for in the concurrent resolution adopted by the Fifty-third Congress, first session, November 1, 1893, may be suspended, and said bills and joint resolutions may be written by hand when in the judgment of the Joint Committee on Printing it is deemed necessary") (emphasis added); *id.* at 2077 (Feb. 12, 1895) (Senate) (amending proposed concurrent resolution to provide "[t]hat, during the last *six* days of any session of Congress the engrossing and enrolling of bills and joint resolutions by printing, as provided for in the concurrent resolution adopted by the Fifty-third Congress, first session, November 1, 1893, may be suspended, and said bills and joint resolutions may be written by hand when in the judgment of the Joint Committee on Printing it is deemed necessary") (emphasis added); *id.* at 2089 (Feb. 12, 1895) (House) (agreeing to amended concurrent resolution).

[30] Act of Mar. 2, 1895, 28 Stat. 764, 769 ("That hereafter the engrossing and enrolling of bills and joint resolutions of either House of Congress shall be done in accordance with the concurrent resolution adopted by the Fifty-third Congress at its first session, November first, eighteen hundred and ninety-three: *Provided*, That during

the printing of enrolled bills "on parchment or paper of suitable quality as shall be determined by the Joint Committee on Printing."[31]  In 1947 these statutes were codified at 1 U.S.C. §§ 106-107 as part of the act creating title I of the United States Code.[32]

Today, 1 U.S.C. §§ 106 and 107 still require that enrolled bills be printed on parchment or suitable paper.  Section 106 provides that "[w]hen such bill, or joint resolution shall have passed both Houses, it shall be printed and shall then be called the enrolled bill, or joint resolution, as the case may be, and shall be signed by the presiding officers of both Houses and sent to the President of the United States."  1 U.S.C § 106.  Section 107 in turn requires that "[e]nrolled bills and resolutions of either House of Congress [] be printed on parchment or paper of suitable quality as shall be determined by the Joint Committee on Printing."  *Id.* § 107.  "During the last six days of a session," however, "such engrossing and enrolling of bills and joint resolutions may be done otherwise than as above prescribed, upon the order of Congress by concurrent resolution."  *Id*. § 106.

Congress's shift from manuscript to print at the end of the nineteenth century—as well as its provision for special flexibility in engrossing and enrollment at the tail end of congressional sessions—provides some additional support for the proposition that Congress has understood the Constitution as leaving to the discretion of the political branches the precise mechanics of preparing bills and thereby complying with the requirements of Article I, Section 7.  So too it shows that Congress has changed such mechanics when it has concluded that improvements in technology or changed circumstances have warranted revisions.[33]

---

the last six days of a session such engrossing and enrolling of bills and joint resolutions may be done otherwise than as prescribed in said concurrent resolution, upon the order of Congress by concurrent resolution.").

[31]  Second Deficiency Appropriation Act, 1920, Pub. L. No. 66-155, 41 Stat. 503, 520 ("Hereafter enrolled bills and resolutions of either House of Congress shall be printed on paper or parchment of suitable quality as shall be determined by the Joint Committee on Printing.").  This relaxation of the parchment requirement was apparently motivated by cost concerns and by the possibility that ink on parchment could be erased.  H.R. Rep. No. 66-683, at 8 (Feb. 27, 1920) (Conf. Rep.); 59 Cong. Rec. 3634 (Feb. 28, 1920) (statement of Rep. James V. McClintic).

[32]  *See* Pub. L. No. 80-278, §§ 106-107, 61 Stat. 633, 634-35 (1947).

[33]  That the procedures for enrollment and presentment may be adapted to changing circumstances is additionally confirmed by the number of occasions on which Congress has authorized departures from the existing rules.  In March 1855, upon report that the Committee on Enrolled Bills would not be able to examine all the bills pending before the adjournment of the session, Congress suspended the rules and permitted the Committee "to report without examination, for the signature of the Speaker," two appropriations bills.  IV *Hinds' Precedents* § 3441.  In May 1874, shortly after the flap over the punctuation error in the tariff bill, the House proposed a concurrent resolution suspending the rules and permitting certain bills to be enrolled in print instead of by hand on parchment.  The Senate initially rejected this proposal but, after conference with the House, agreed that the bills in question should be "printed upon paper, and duly examined and certified by the Joint Committee on Enrolled Bills provided by the joint rules."  *Id.* § 3442; *see* 2 Cong. Rec. 4380-83 (May 29, 1874) (Senate); *id.* at 4465 (June 2, 1874) (Senate); *id.* at 4483 (June 2, 1874) (House).

Even after the shift to the modern process of printing enrolled bills, Congress has frequently authorized departures from the statutory rule.  It has done so sometimes through concurrent resolutions, other times through joint resolutions or statutes temporarily waiving the print requirements for specific bills or types of bills.  *See* Appendix 2 (non-exclusive list of occasions when Congress has waived print requirements in 1 U.S.C. §§ 106 and 107 or predecessor statutes); *see also* 1 U.S.C. § 106 note (listing waivers); *Preparation of Slip Laws from Hand-*

**D**

We are unaware of any case law that is directly on point, but there are two Supreme Court decisions that may be said to have some bearing on the question. The first is the rather unusual one of *United States v. Wright*, 302 U.S. 583 (1938). That case concerned a situation in which the ten-day period for return of a bill that had originated in the Senate expired while the Senate was on a three-day recess, but the House remained in session. The bill at issue authorized the Court of Claims to hear a particular suit. The President returned the bill on the ninth day with his objections by delivering them to the Secretary of the Senate, who accepted the delivery. When the Senate returned from recess, the Secretary of the Senate laid the documents before the Senate, which considered the bill as having been vetoed. The plaintiff whose suit the bill would have authorized filed suit anyway, claiming that the President's return had to be to the Senate, not to the Secretary of the Senate, and that only an adjournment by both chambers could prevent return so as to lead to a "pocket veto." To veto the bill, the plaintiff contended, the President should have returned it before the start of the Senate's recess.

The Supreme Court disagreed. It rejected the contention that the requirement in Article I, Section 7 that the President, upon disapproving a bill, return it "to that House in which it shall have originated," mandates return to the chamber itself and thus requires return when the chamber is in session. On the contrary, the Court held that the Constitution permits return to an agent of the House or the Senate. "In returning the bill to the Senate by delivery to its Secretary during the recess there was no violation of any express requirement of the Constitution," the Court explained. "*The Constitution does not define what shall constitute a return of a bill* or deny the use of appropriate agencies in effecting the return." *Wright*, 302 U.S. at 598 (emphasis added). *Wright*, then, supports the notion that the Constitution itself does not define the

---

*Enrolled Legislation*, 13 Op. O.L.C. 353, 355-56 (1989) ("*Slip Laws*") (same). These departures have created occasional confusion concerning what language is actually a part of a bill that passed, *see, e.g.*, *Slip Laws*, 13 Op. O.L.C. at 358-60 (in publishing hand-enrolled legislation that was authorized by congressional waiver of print requirement in 1 U.S.C. §§ 106 and 107, National Archives and Records Administration may not make even minor editorial corrections or reconstruct illegible text and must instead typeset legible portions and photograph illegible portions for insertion in slip law), but so have the standard procedures in 1 U.S.C. §§ 106 and 107, *see, e.g.*, Memorandum for Jeffrey A. Rosen, General Counsel, Office of Management and Budget, from Steven G. Bradbury, Principal Deputy Assistant Attorney General, *Re: Validity of the Food, Conservation, and Energy Act of 2008* (May 23, 2008) (discussing bill in which enrolled version omitted a title passed by both Houses of Congress); *OneSimpleLoan v. U.S. Sec'y of Education*, 496 F.3d 197, 199-201 (2d Cir. 2007) (discussing discrepancy between enrolled version of Deficit Reduction Act of 2005 and version adopted in the House); *Public Citizen v. United States Dist. Ct. for the District of Columbia*, 486 F.3d 1342, 1344-45 (D.C. Cir. 2007) (same); Memorandum for the Files from Douglas W. Kmiec, Assistant Attorney General, Office of Legal Counsel, *Re: Omission of Section from Enrolled Continuing Resolution* (Nov. 13, 1986) (memorializing advice that, to cure accidental omission of important section from enrolled version of continuing resolution the President signed into law, the entire continuing resolution including the omitted text should be enrolled by Congress again and presented to the President), and for that matter so did the original hand-enrollment process, *see, e.g.*, text accompanying nn. 20-22 *supra*; *Marshall Field & Co. v. Clark*, 143 U.S. 649 (1892) (rejecting challenge to validity of tariff act, despite evidence that rebate provisions approved by both chambers of Congress had improperly been omitted from enrolled bill presented to and signed by the President). Again, we are not aware of any suggestion that a particular method of enrollment (or presentment) employed by Congress was prohibited by the Constitution.

mechanics of "return" (and presumably presentment as well) but instead leaves the determination of such logistics to the political branches.[34]

*Marshall Field & Co. v. Clark*, 143 U.S. 649 (1892), may also provide some indirect support for that conclusion. In *Marshall Field*, several companies sought to have a tariff act invalidated on the ground that it did not comply with Article I, Section 7 because the enrolled and signed version of the act omitted a provision that had been included in the bill as adopted by both chambers of Congress. Relying principally on the Journal Clause in Article I, Section 5, the companies urged the Supreme Court to look to various documents from the legislative process— journals, committee reports, and records of proceedings—to determine that the law actually adopted by the House and Senate varied from the one enrolled, presented to the President, and signed by him.[35] The Court refused to do so. Adopting what has since been called "the enrolled bill rule," *see, e.g.*, *United States v. Farmer*, 583 F.3d 131, 151-52 (2d Cir. 2009); *Public Citizen*, 486 F.3d at 1349-50, it held that courts should not look behind the version of a statute certified by the presiding officers of the two chambers, signed by the President, and deposited by him with the official federal repository as the enacted law. The Court explained that its decision was largely dictated by the respect due to the political branches in handling such matters:

> The signing by the Speaker of the House of Representatives, and by the President of the Senate, in open session, of an enrolled bill, is an official attestation by the two houses of such bill as one that has passed Congress. It is a declaration by the two houses, through their presiding officers, to the President,

---

[34] As Justices Stone and Brandeis pointed out in dissent in *Wright*, there is some tension between that decision and the decision just nine years earlier in *The Pocket Veto Case*, 279 U.S. 655 (1929). *See Wright*, 302 U.S. at 599 (Stone, J., dissenting). In the *Pocket Veto Case*, the Court held that the adjournment after the first session of a Congress, not just an adjournment between one Congress and the next, constitutes an adjournment for purposes of the last sentence of the second paragraph of Article I, Section 7: "If any Bill shall not be returned by the President within ten Days (Sundays excepted) after it shall have been presented to him, the Same shall be a Law, in like Manner as if he had signed it, unless the Congress by their *Adjournment* prevent its Return, in which Case it shall not be a Law." U.S. Const. art. I, § 7 (emphasis added). In reaching that conclusion the Court accepted the position urged by the United States that in requiring the President to return a disapproved bill to "that House in which it shall have originated," *id*., the Constitution mandates that "it is to be returned to the 'House' when sitting in an organized capacity for the transaction of business, and having authority to receive the return, enter the President's objections on its journal, and proceed to reconsider the bill; and that no return can be made to the House when it is not in session as a collective body and its members are dispersed." *Pocket Veto Case*, 279 U.S. at 683. The *Wright* Court dismissed this reasoning as dictum: "In the *Pocket Veto Case*, the Congress had adjourned. The question was whether the concluding clause of paragraph 2 of section 7 of Article 1 was limited to a *final* adjournment of the Congress or embraced an adjournment of the Congress at the close of the first regular session. The Court held that the clause was not so limited and applied to the latter. In interpreting the word 'adjournment,' and in referring to other provisions of the Constitution using the word 'adjourn,' the Court was still addressing itself to a case where there had been an adjournment by the Congress. The Court did not decide, and there was no occasion for ruling, that the clause applies where the Congress has not adjourned and a temporary recess has been taken by one House during the session of Congress. Any observations which could be regarded as having a bearing upon the question now before us would be taken out of their proper relation." *Wright*, 302 U.S. at 593.

[35] The Journal Clause provides: "Each House shall keep a Journal of its Proceedings, and from time to time publish the same, excepting such Parts as may in their Judgment require Secrecy; and the Yeas and Nays of the Members of either House on any question shall, at the Desire of one fifth of those Present, be entered on the Journal." U.S. Const. art. I, § 5, cl. 3.

that a bill, thus attested, has received, in due form, the sanction of the legislative branch of the government, and that it is delivered to him in obedience to the constitutional requirement that all bills which pass Congress shall be presented to him. And when a bill, thus attested, receives his approval, and is deposited in the public archives, its authentication as a bill that has passed Congress should be deemed complete and unimpeachable. As the President has no authority to approve a bill not passed by Congress, an enrolled act in the custody of the Secretary of State, and having the official attestations of the Speaker of the House of Representatives, of the President of the Senate, and of the President of the United States, carries on its face a solemn assurance by the legislative and executive departments of the government, charged, respectively, with the duty of enacting and executing the laws, that it was passed by Congress. The respect due to coequal and independent departments requires the judicial department to act upon that assurance, and to accept, as having passed Congress, all bills authenticated in the manner stated; leaving the courts to determine, when the question properly arises, whether the act so authenticated, is in conformity with the Constitution.

*Marshall Field*, 143 U.S. at 672. The Court observed that no provision "either expressly or by necessary implication, prescribe[s] the mode in which the fact of the original passage of a bill by the House of Representatives and the Senate shall be authenticated, or preclude Congress from adopting any mode to that end which its wisdom suggests." *Id.* at 671. The Court was not addressing the presentment process. Nor was it offering a gloss on the word "bill" in Article I, Section 7. But its approach comports with the broader notion that the methods of determining what constitutes the authoritative text of a bill for purposes of compliance with the Constitution's bicameralism and presentment requirements rest in the sound discretion of the political branches.[36]

*   *   *   *

---

[36] In *United States v. Munoz-Flores*, 495 U.S. 385 (1990), a case about the Origination Clause in Article I, Section 7, the Court characterized *Marshall Field* as "concern[ing] 'the nature of the evidence' the Court would consider in determining whether a bill had actually passed Congress." *Id.* at 391 n.4 (citation omitted). The *Munoz-Flores* Court stated: "Appellants had argued that the constitutional Clause providing that '[e]ach House shall keep a Journal of its Proceedings' implied that whether a bill had passed must be determined by an examination of the journals. See *ibid.* (quoting Art. I, § 5) (internal quotation marks omitted). The Court rejected that interpretation of the Journal Clause, holding that the Constitution left it to Congress to determine how a bill is to be authenticated as having passed. In the absence of any constitutional requirement binding Congress, we stated that '[t]he respect due to coequal and independent departments' demands that the courts accept as passed all bills authenticated in the manner provided by Congress. Where, as here, a constitutional provision *is* implicated, *Field* does not apply." *Id.* (citations omitted). We consider this footnote consistent with our understanding of *Marshall Field*'s significance for the question we address.

Two courts of appeals have held that Congress may present bills to the President after an adjournment *sine die*. *See Mester Mfg. v. INS*, 879 F.2d 561, 570-71 (9th Cir. 1989); *United States v. Kapsalis*, 214 F.2d 677, 680-83 (7th Cir. 1954). Both courts endorsed the view that Article I, Section 7 does not "provide how or when . . . bills, after they have been passed by both Houses, are to be presented to the President." *Kapsalis*, 214 F.2d at 680; *see Mester Mfg.*, 879 F.2d at 571 ("In the absence of express constitutional direction, we defer to the reasonable procedures Congress has ordained for its internal business.").

In sum, considering the text and purposes of the second paragraph of Article I, Section 7, the practice of the political branches under that provision, and the limited relevant judicial authorities, we conclude that the Constitution permits Congress to authorize presentment and return by electronic means.

## II

The question remains whether electronic transmission would be consistent with the existing statutes governing enrollment and, to a degree, presentment. Section 106 of title I provides:

> Every bill or joint resolution in each House of Congress shall, when such bill or resolution passes either House, be printed, and such printed copy shall be called the engrossed bill or resolution as the case may be. Said engrossed bill or resolution shall be signed by the Clerk of the House or the Secretary of the Senate, and shall be sent to the other House, and in that form shall be dealt with by that House and its officers, and, if passed, returned signed by said Clerk or Secretary. *When such bill, or joint resolution shall have passed both Houses, it shall be printed and shall then be called the enrolled bill, or joint resolution, as the case may be, and shall be signed by the presiding officers of both Houses and sent to the President of the United States.* During the last six days of a session such engrossing and enrolling of bills and joint resolutions may be done otherwise than as above prescribed, upon the order of Congress by concurrent resolution.

1 U.S.C. § 106 (emphasis added). Section 107, in turn, provides that "[e]nrolled bills and resolutions of either House of Congress shall be printed on parchment or paper of suitable quality as shall be determined by the Joint Committee on Printing." *Id*. § 107. Thus, an enrolled bill must be printed. It must be signed by the presiding officers of the two houses. Only then may "it" be "sent" to the President. *Id.* § 106.

Like the terms "presented" and "return," the word "sent" connotes delivery without specifying the precise method of transmission.[37] Thus, one might well read section 106 as permitting an enrolled bill to be sent to the President by electronic means. Electronic transmission would pose verification and authentication issues, to be sure, but the historical record discussed above demonstrates that so too does paper. If electronic transmission were employed, it would be incumbent upon Congress and the President, as it always has been, to minimize the possibility of error and to ensure authentication.[38]

---

[37] *See Webster's Third New International Dictionary* at 2065 ("to dispatch by a means of communication"); *The Random House Dictionary of the English Language* at 1743 ("to cause to be conveyed or transmitted to a destination"); *The American Heritage Dictionary of the English Language* at 1584 ("to cause to be conveyed by an intermediary to a destination"; "[t]o dispatch, as by a communications medium").

[38] The House and Senate Rules also contain provisions addressing enrollment and presentment. *See* House Rule II.2(d)(2) ("The Clerk shall examine all bills, amendments, and joint resolutions after passage by the House and, in cooperation with the Senate, examine all bills and joint resolutions that have passed both Houses to see that they are correctly enrolled and forthwith present those bills and joint resolutions that originated in the House to the President in person after their signature by the Speaker and the President of the Senate, and report to the House the

Given that the statute codified in sections 106 and 107 was originally adopted in the 1890s, modern means of electronic transmission plainly were not within the contemplation of the Congress that enacted it. Moreover, section 107 requires that "[e]nrolled bills and resolutions of either House of Congress shall be printed on parchment or paper of suitable quality." 1 U.S.C. § 107. Thus, one might reasonably understand section 106's requirement of certification of each enrolled bill by the chambers' presiding officers and the specification that "*it* shall be printed . . . signed . . . and sent to the President," 1 U.S.C. § 106 (emphasis added), as mandating delivery of the parchment or paper copy that bears the presiding officers' original signatures. As far as we are aware, that has been Congress's unbroken practice.[39]

Given the ambiguity about whether sections 106 and 107 authorize presentment by electronic means and the need to ensure that Congress, the President, and the public understand in advance the methods by which the steps required to accomplish enactment of a federal law may be carried out, we recommend that, before electronic presentment might be used, 1 U.S.C. §§ 106 and 107 be amended to clarify that they permit electronic presentment. The advisability of statutory amendment is perhaps heightened by the language of the related statutory provision that specifies how bills are to be preserved in the National Archives:

> Whenever a bill, order, resolution, or vote of the Senate and House of Representatives, having been approved by the President, or not having been returned by him with his objections, becomes a law or takes effect, it shall forthwith be received by the Archivist of the United States from the President; and whenever a bill, order, resolution, or vote is returned by the President with his objections, and, on being reconsidered, is agreed to be passed, and is approved by two-thirds of both Houses of Congress, and thereby becomes a law or takes effect, it shall be received by the Archivist of the United States from the President of the Senate, or Speaker of the House of Representatives in whichsoever House it shall last have been so approved, and he shall carefully preserve the originals.

---

fact and date of their presentment."); Senate Rule XIV.5 ("All bills, amendments, and joint resolutions shall be examined under the supervision of the Secretary of the Senate before they go out of the possession of the Senate, and all bills and joint resolutions which shall have passed both Houses shall be examined under the supervision of the Secretary of the Senate, to see that the same are correctly enrolled, and, when signed by the Speaker of the House and the President of the Senate, the Secretary of the Senate shall forthwith present the same, when they shall have originated in the Senate, to the President of the United States and report the fact and date of such presentation to the Senate."). For a brief description of the precise procedures followed by Congress in engrossing, enrolling, and presenting bills, see R. Eric Petersen, Cong. Research Serv., 98-826 GOV, *Engrossment, Enrollment, and Presentation of Legislation* (updated Mar. 24, 2008). Presumably, the House Rule should be amended to remove the words "in person" before enrolled bills originating in the House would be presented to the President by electronic means.

[39] We are unaware of any legislative history that bears on the meaning of section 106 in this regard. *See* S. Rep. No. 80-658, at 4-5, 16 (1947) (Conf. Rep.); H.R. Rep. No. 80-251, at 5-6 (1947); H.R. Rep. No. 66-701 (1920) (Conf. Rep.); H.R. Rep. No. 66-683 (1980) (Conf. Rep.); S. Rep. No. 66-426 (1920); H.R. Rep. No. 66-584 (1920); H.R. Rep. No. 53-1758 (1895); S. Rep. No. 53-965 (1895); *Legislative, Executive, and Judicial Appropriation Bill: Hearings on H.R. 8767 Before Subcomm. of H. Comm. on Appropriations*, 53d Cong., 3d Sess. (1895).

Section 107 does expressly leave to the Joint Committee on Printing some discretion in selecting the medium on which enrolled bills should be printed, but it is not clear that that discretion would extend to selecting the method of transmitting enrolled bills.

*Id*. § 106a.  In the event that Congress were to present a bill to the President and the President were to return it by electronic transmission via .pdf file and Congress were to override the veto, it is unclear which documents would count as the "originals" mentioned at the end of this provision—a printout of the bill as returned by the President, or the hard copy as signed by the presiding officers before a .pdf file of the bill was prepared for presentment to the President.  The desirability of eliminating any ambiguity on this score also counsels in favor of statutory clarification.

No statute currently governs the manner in which the President returns a bill when he disapproves it, and it is not necessary for Congress expressly to authorize the President to use electronic means to return a bill.  Nevertheless, for purposes of authentication and clarity, we recommend that Congress and the President reach an agreement, whether memorialized by statute or otherwise, concerning the permissibility of electronic return.  Such a statute regulating the manner of return would have to be written so that it did not "impede the President's ability to perform his constitutional duty."  *Morrison v. Olson*, 487 U.S. 654, 691 (1988).

/s/

JONATHAN G.  CEDARBAUM
Deputy Assistant Attorney General

**APPENDIX 1**

*White House Memorandum to File Regarding Bill That
Became Law by President's Signature on Duplicate*

**THE WHITE HOUSE**
WASHINGTON

June 9, 1938.

Memorandum:

The attached bill, S. 3532, "An Act to extend the times for commencing and completing the construction of a bridge across the Missouri River at or near Randolph, Missouri," was received at the White House on May 19, 1938, referred to the War Department on the same day for report, and returned to the White House by the War Department on May 21, 1938, with the recommendation that it be approved. The bill became misplaced and on May 27, 1938, the President in a message to the Senate, copy attached, advised that body that the bill had become lost and requested that a duplicate be authorized. A duplicate was received at the White House on May 27th from the Senate and it was signed by the President on May 31, 1938, and filed in the State Department the same day and given Public Law No. 556, copy attached.

On June 9, 1938, the attached original bill was discovered in the White House.

## APPENDIX 2

***Authorized Departures from the Printing Requirements in
1 U.S.C. §§ 106 and 107 (or Their Predecessor Statutes)***

• On November 10, 1999, the 106th Congress passed a statute waiving the requirements of 1 U.S.C. §§ 106 and 107 for the remainder of the first session "with respect to the printing (on parchment or otherwise) of the enrollment of any bill or joint resolution making general appropriations or continuing appropriations for the fiscal year ending September 30, 2000." Pub. L. No. 106-93, 113 Stat. 1310.

• On October 12, 1998, the 105th Congress passed a statute waiving the requirements of 1 U.S.C. §§ 106 and 107 for the remainder of the second session "with respect to the printing (on parchment or otherwise) of the enrollment of any bill or joint resolution making general appropriations or continuing appropriations for the fiscal year ending September 30, 1999." Pub. L. No. 105-253, 112 Stat. 1887.

• On November 26, 1997, the 105th Congress passed a statute waiving the requirements of 1 U.S.C. §§ 106 and 107 for the remainder of the second session "with respect to the printing (on parchment or otherwise) of the enrollment of any bill or joint resolution making general appropriations for the fiscal year ending on September 30, 1998, or continuing appropriations for the fiscal year ending on September 30, 1998." Pub. L. No. 105-120, 111 Stat. 2527.

• On August 1, 1997, the 105th Congress passed a statute waiving the requirements of 1 U.S.C. §§ 106 and 107 "with respect to the printing (on parchment or otherwise) of the enrollment of" two bills: H.R. 2014 and H.R. 2015. Pub. L. No. 105-32, 111 Stat. 250. H.R. 2014 was ultimately enacted as Pub. L. No. 105-34, 111 Stat. 788 (1997), and H.R. 2015 as Pub. L. No. 105-33, 111 Stat. 251 (1997).

• On September 30, 1996, the 104th Congress passed a statute waiving the requirements of 1 U.S.C. §§ 106 and 107 "with respect to the printing (on parchment or otherwise) of the enrollment of any appropriation measure" for fiscal year 1997, passed during the remainder of the second session. Pub. L. No. 104-207, § 1(a), 110 Stat. 3008.

• On April 9, 1996, the 104th Congress passed a statute waiving the requirements of 1 U.S.C. §§ 106 and 107 "with respect to the printing (on parchment or otherwise) of the enrollment of" two bills: H.R. 3019 and H.R. 3136. Pub. L. No. 104-129, 110 Stat. 1199. H.R. 3019 was ultimately enacted as Pub. L. No. 104-134, 110 Stat. 1321 (1996), and H.R. 3136 as Pub. L. No. 104-121, 110 Stat. 847 (1996).

• In November 1995, the 104th Congress twice passed a statute waiving the requirements of 1 U.S.C. §§ 106 and 107 "with respect to the printing (on parchment or otherwise) of the enrollment of any of the following measures . . . " for fiscal year 1996, passed during the remainder of the first session. Pub. L. No. 104-54, § 201(a), 109 Stat. 540, 545 (Nov. 19, 1995); Pub. L. No. 104-56, § 201(a), 109 Stat. 548, 553 (Nov. 20, 1995).

• On October 6, 1992, the 102d Congress passed a statute waiving the requirements of 1 U.S.C. §§ 106 and 107 "with respect to the printing (on parchment or otherwise) of the enrollment of any appropriation bill" for fiscal year 1993, passed during the remainder the second session.  Pub. L. No. 102-387, 106 Stat. 1519.

• On March 20, 1992, the 102d Congress passed a statute waiving the requirements of 1 U.S.C. §§ 106 and 107 "with respect to the printing (on parchment or otherwise) of the enrollment of H.R. 4210 [the Tax Fairness and Economic Growth Act of 1992]."  Pub. L. No. 102-260, 106 Stat. 85.  That same day, however, President Bush vetoed the bill.

• On October 31, 1990, the 101st Congress passed a statute waiving the requirements of 1 U.S.C. §§ 106 and 107 "with respect to the printing (on parchment or otherwise) of the enrollment of S. 2830."  Pub. L. No. 101-497, § 1(a), 104 Stat. 1205.  S. 2830 became the Food, Agriculture, Conservation, and Trade Act of 1990, Pub. L. No. 101-624, 104 Stat. 3359.

• On October 27, 1990, the 101st Congress passed a statute waiving the requirements of 1 U.S.C. §§ 106 and 107 "with respect to the printing (on parchment or otherwise) of the enrollment of any reconciliation bill, appropriation bill, or continuing resolution" for fiscal year 1991, passed during the remainder of the second session.  Pub. L. No. 101-466, § 1(a), 104 Stat. 1084.

• On September 29, 1988, the 100th Congress passed a statute waiving the requirements of 1 U.S.C. §§ 106 and 107 "with respect to the printing (on parchment or otherwise) of the enrollment of any general appropriations bill making appropriations for the fiscal year ending September 30, 1989."  Pub. L. No. 100-454, § 1(a), 102 Stat. 1914.

• On December 21, 1987, the 100th Congress passed a joint resolution "[a]uthorizing the hand enrollment of the budget reconciliation bill and of the full-year continuing resolution for fiscal year 1988."  H.R.J. Res. 426, Pub. L. No. 100-199, 101 Stat. 1326.  The next day, President Reagan signed these two bills into law:  the Omnibus Budget Reconciliation Act of 1987, Pub. L. No. 100-203, 101 Stat. 1330, and the continuing resolution for fiscal year 1988, Pub. L. No. 100-202, 101 Stat. 1329.  Each of these laws required the President to make certain that the hand enrollment he signed matched the printed enrollment that would later be signed by the presiding officers of each house and by the President.  Pub. L. No. 100-203, § 8004, 101 Stat. 1330-282; Pub. L. No. 100-202, § 630(n), 101 Stat. 1329-432.  On January 28, 1988, the President delegated to [the National Archives and Records Administration] the responsibility to ensure that the hand enrollment matched the printed enrollment.  53 Fed. Reg. 2816.

• On October 9, 1986, the 99th Congress passed a joint resolution providing "[t]hat the requirement of sections 106 and 107 of title I, United States Code, that the enrollment of the following bills and joint resolutions be printed on parchment be waived during the remainder of the second session of the Ninety-ninth Congress, and that the enrollment of said bills and joint resolutions be in such form as may be certified by the Committee on House Administration to be truly enrolled:  H.R. 2005; H.R. 3838; H.R. 5300; H.R. 5484; and H.J. Res. 738, or any other measure continuing appropriations."  H.R.J. Res. 749, Pub. L. No. 99-463, 100 Stat. 1184.

• On December 18, 1985, the 99th Congress passed a joint resolution providing "[t]hat the requirement of sections 106 and 107 of title I, United States Code, that the enrollment of any bill or joint resolution originating in the House be printed on parchment be waived at the discretion of the Speaker, after consultation with the Minority Leader of the House, for the duration of the first session of the Ninety-ninth Congress, and that any enrollment be in such form as may be certified by the Committee on House Administration to be truly enrolled." H.R.J. Res. 485; Pub. L. No. 99-188, 99 Stat. 1183.

• On October 11, 1984, the 98th Congress passed a concurrent resolution providing "[t]hat the requirement of 1 U.S.C. 107 that the enrollment of H.J. Res. 648 or any measure continuing appropriations be printed on parchment be waived for the duration of the Ninety-eighth Congress, and that the enrollment of H.J. Res. 648 or any measure continuing appropriations be in such form as may be certified by the Committee on House Administration to be a truly enrolled joint resolution." H.R. Con. Res. 375, 98 Stat. 3519.

• On December 20, 1982, the 97th Congress passed a concurrent resolution providing "[t]hat the requirement of 1 U.S.C. 107 that the enrollment of H.J. Res. 631 or any measure continuing appropriations be printed on parchment be waived for the duration of the Ninety-seventh Congress, and that the enrollment of H.J. Res. 631 or any measure continuing appropriations be in such form as may be certified by the Committee on House Administration to be a truly enrolled joint resolution." H.R. Con. Res. 436, 96 Stat. 2678.

• On February 25, 1929, the 70th Congress passed a concurrent resolution providing "[t]hat during the remainder of the present session of Congress, engrossment and enrolling of bills and joint resolutions by printing, as provided by an Act of Congress, approved March 2, 1895, may be suspended, and said bills and joint resolutions may be engrossed and enrolled by the most expeditious methods consistent with accuracy." H.R. Con. Res. 59, 45 Stat. 2398.

• On February 25, 1901, the 56th Congress passed a concurrent resolution providing "[t]hat during the remainder of the present session of Congress the engrossment and enrolling of bills and joint resolutions by printing, as provided by an act of Congress approved March second, eighteen hundred and ninety-five, may be suspended, and said bills and joint resolutions may be written by hand." H.R. Con. Res. 432, 31 Stat. 2003; 34 Cong. Rec. 3007.

• On June 5, 1900, the 56th Congress passed a concurrent resolution providing "[t]hat during the remainder of the present session of Congress the engrossing and enrolling of bills and joint resolutions by printing, as provided by act of Congress approved March second, eighteen hundred and ninety-five, may be suspended, and said bills and joint resolutions may be written by hand." 31 Stat. 1995, 1995.

• On February 25, 1899, the 55th Congress passed a concurrent resolution providing "[t]hat during the last six days of the present session of Congress the engrossing and enrolling of bills and joint resolutions by printing, as provided by act of Congress, approved March second, eighteen hundred and ninety-five, may be suspended, and said bills and joint resolutions may be written by hand." 30 Stat. 1806, 1806.

• On July 8, 1898, the 55th Congress passed a concurrent resolution providing "[t]hat during the remaining days of the present session of Congress the engrossing and enrolling of bills and joint resolutions by printing, as provided by act of Congress approved March second, eighteen hundred and ninety-five, may be suspended, and said bills and joint resolutions may be written by hand."  30 Stat. 1802, 1802.